# Ex. C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF MARYLAND, 100 State Circle, Annapolis, MD 21401,<br><br>ANTHONY BROWN, Attorney General of the State of Maryland, in his Official Capacity, 200 St. Paul Place, Baltimore, MD 21202,<br><br>MARYLAND POLICE TRAINING AND STANDARDS COMMISSION, 6852 4th Street,<br>Sykesville, MD 21784, Sykesville, MD 21784,<br><br>PRINCE GEORGE'S COUNTY, MD, 1301 McCormick Drive, Largo, MD, and<br><br>MONTGOMERY COUNTY, MD, 101 Monroe<br>Street, Rockville, MD 20850,<br><br>Defendants. | No. 1:26-cv-04110-JRR |

**DECLARATION OF NIKITA BAKER**

I, Nikita Baker, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as Deputy Field Office Director (DFOD) covering the Baltimore Resident Office in the Washington, D.C. Area of Responsibility (AOR). I have held the position of DFOD since June 2024.

2. As a Deputy Field Office Director, I direct and maintain oversight of all

immigration enforcement operations, programs, and activities in all twenty-four counties in Maryland. As part of my oversight duties, I am responsible for leading efforts in identifying, arresting, detaining, pursuing for prosecution, and removing aliens who are in violation of the federal immigration statutes and regulations. My responsibilities include collaborating with law enforcement partners to arrest and remove dangerous criminal aliens from the community in support of ICE's public safety mission. The ERO Baltimore Resident Office supports the local offices of our federal partners, including the Federal Bureau of Investigation ("FBI"), U.S. Marshals Service, Alcohol Tabacco and Firearms ("ATF"), and Drug Enforcement Administration ("DEA").

3. Prior to being appointed to my current position, I served as the Acting Deputy Assistant Director and Unit Chief for U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations, Headquarters Field Operations Division, where I over saw all of the field offices in the Southeast Region. The Field Operations Division provides guidance on policy and procedures, facilitating coordination with ERO's national field offices and headquarters. Field Operations manages programs and initiatives to identify, arrest, prosecute and remove priority aliens. Additionally, I have over 19 years of service with ICE in various operational and leadership positions.

4. The purpose of this declaration is to inform the court about conditions on the ground in the State of Maryland and how enforcement of the Maryland Senate Bill 1, Prince George's County Council Bill CB-008-2026, and Montgomery County Council Bill 5-26, will obstruct the enforcement of federal immigration law.

5. Based on my experience and the nature of my official duties, I am familiar with the impacts on ICE that will occur from the enforcement of these three bills.

6. This declaration is based upon my personal knowledge and information made available to me in my official capacity. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry into the above-captioned case.

**BACKGROUND**

7. ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which has offices in 130 locations throughout the United States and at ICE Headquarters.

8. ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

9. The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, initiating removal proceedings, and, when appropriate, detaining aliens during removal proceedings or if they are subject to a final order of removal, until their removal from the United States. ERO's enforcement activities include locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails, and working with those authorities to transfer such aliens to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

10. ERO Washington (D.C.) is responsible for interior enforcement of U.S. immigration laws in all twenty-four counties within the State of Maryland. This includes the identification and apprehension of aliens removable from the United States, the service of legal documents on removable aliens, and immigration case management during removal proceedings. ERO is also tasked with carrying out orders by Immigration Judges regarding the continued detention, release, or removal of aliens who have been placed in removal proceedings by other DHS immigration components.

11. As DFOD within ERO Washington (D.C.), I direct and maintain oversight of all immigration enforcement, detention, monitoring, and removal operations in all twenty-four counties within the State of Maryland.

**MARYLAND SENATE BILL 1 (SB 1)**

12. On May 26, 2026, Governor Wes Moore signed Maryland Senate Bill 1 (SB 1), titled "Public Safety – Law Enforcement Officers – Prohibition on Face Coverings and Identification," into law.

13. SB 1 prohibits law enforcement officers, including federal officers from ICE, from wearing face coverings while performing official duties in Maryland, except as authorized by the uniform policy adopted by the Maryland Police Training and Standards Commission.

14. SB 1 further requires uniformed officers to wear identification on the outermost layer of clothing and to verbally disclose their agency or department, last name, and badge number or other identification number upon request, with exceptions for officers working in a plain clothes, non-uniformed, or undercover capacity.

15. A violation of these sections constitutes a civil offense, subject to a fine not exceeding $1,500, and constitutes police misconduct for purposes of Maryland law. The bill authorizes a police officer with probable cause to issue a citation, requires the citation to be forwarded to the District Court for trial, and permits the State's Attorney for a county to prosecute the civil offense in the same manner as prosecution of violations of the State's criminal laws.

16. The Maryland Attorney General advised the Governor that the bill was legally sufficient and not clearly unconstitutional as a whole, but warned that applying its face-covering and identification requirements to federal law enforcement presents significant Supremacy Clause risk because it may directly regulate how federal officers conduct federal law enforcement operations and that Maryland officers have discretion to issue civil citations for violations

17. The Bill goes into effect on October 1, 2026.

**PRINCE GEORGE'S COUNTY COUNCIL BILL CB-008-2026 (CB-008)**

18. Prince George's County Council Bill CB-008-2026 (CB-008), titled "An Emergency Act Concerning Prohibition on Facial Coverings for Law Enforcement," became law on April 29, 2026.

19. CB-008 prohibits certain law enforcement officers from wearing face coverings

that conceal or obscure their face while interacting with the public in the performance of official duties in Prince George's County.

20. CB-008 further requires uniformed officers to clearly display their name and identification number, with exceptions for situations where masks are necessary for safety and effectiveness, such as undercover work, SWAT operations, medical protection, or hazardous conditions.

21. A law enforcement officer found in violation of this bill constitutes a criminal offense of misdemeanor, subject to imprisonment of up to six months and a fine not exceeding $5,000.

## MONTGOMERY COUNTY COUNCIL BILL 5-26 (CB 5-26)

22. Montgomery County Council Bill 5-26 (CB 5-26), titled "Police - Mask or Facial Coverings - Prohibited," also known as "The Unmask ICE Act," was introduced on January 20, 2026, and was scheduled for final Council action on April 28, 2026.

23. CB 5-26 prohibits federal, state, or local law enforcement officers from wearing masks or facial coverings while interacting with the public in the performance of their duties in Montgomery County.

24. CB 5-26 further requires law enforcement officers to wear identification on the outermost layer of clothing while on duty and to verbally disclose their identification upon request, with exceptions for officers operating in a plain clothes, non-uniformed, undercover, or covert capacities.

25. The bill permits masks or facial coverings in limited circumstances, including medical-grade masks, protection from smoke, water rescue operations, biological or chemical hazards, cold weather during a declared weather emergency, occupational health and safety

requirements, reasonable workplace accommodations, and SWAT-related face protection.

26. A County police officer or member of the public who witnesses a violation may file a complaint through an online platform designated by the County Executive, and the information may be used by the Office of the County Attorney to enforce County law or make referrals, including to the Police Accountability Board.

27. Bill 5-26 includes a preemption clause stating that it should not be interpreted or applied to conflict with federal or state law, and the bill sunsets once the Maryland Police Training and Standards Commission adopts a statewide uniform policy on face coverings or identification under Maryland Senate Bill 1.

## PROTECTING OFFICERS' PERSONAL IDENTITIES IS CRITICAL FOR OFFICER SAFETY AND OPERATIONAL EFFECTIVENESS

28. Protecting federal immigration officers' personal identities during enforcement operations is a critical tool serving vital safety and operational purposes. Protecting the personal identities of federal officers and their families is more urgent today in part due to the increasingly common threats of targeted harassment of and retaliation against federal immigration officers for simply doing their jobs.

29. Individuals, including immigration activists and other members of the public, routinely photograph, film, and publish online ICE ERO enforcement actions to include the personal identities of ICE officers and other federal task force personnel, as well as information regarding the vehicles used by ICE officers, including the make and model and license plate numbers. The photographs and films are posted online for the sole purpose of intimidating and harassing government employees and are directly used by members of local organized crime and transnational criminal organizations in serious and potentially deadly ways.

30. During enforcement actions, ICE personnel regularly observe and overhear individuals shouting phrases such as "doxx these people," "find out who they are and where they live," and "we will find out who you are and who your family members are."

31. ICE officers are also seeing a 1000% increase in assaults and an 8000% increase in death threats against them.

32. DHS has obtained credible intelligence indicating that Mexican criminals, in coordination with domestic extremist groups, have placed targeted bounties for the murders of ICE and U.S. Customs and Border Patrol (CBP) personnel in a tiered bounty system. Cartels have disseminated a structured bounty program to incentivize violence against federal personnel, with payouts escalating based on rank and action taken: (1) $2,000 for gathering intelligence or doxxing officers (including photos and family details); (2) $5,000–$10,000 for kidnapping or non-lethal assaults on standard ICE/CBP officers/agents; and (3) up to $50,000 for the assassination of high-ranking officials.

33. Protesters have presented other safety threats including blocking traffic in and around hotels at which officers and agents are staying, unleashing a barrage of honking at all hours of the day and night, and in one instance, slashing the tires of an unmarked government vehicle parked at the hotel parking lot.

34. During protests at ICE offices, there have been numerous attempts by activists, protesters, and agitators to identify and dox our staff as they enter and exit federal properties. In addition, it is a regular occurrence for members of the public to interfere with and attempt to document the activities and identities of our officers conducting field operations.

35. Doxing of ICE officers/agents has also been encouraged across the internet, on websites such as ICESpy.org. Individuals are taking pictures of ICE officers' faces and running

those pictures through facial recognition applications that will search all of social media. Once a match is made, they will continue to search for family members, including children. Once all the family members are identified, they have attempted to locate the family's home. The findings are posted on anti-ICE websites.

36. On December 12, 2025, an ERO Washington (D.C.)/Salisbury, MD Sub-Office employee's spouse's Facebook business profile was doxed. The post includes specific personal identifiable information regarding the officer's professional affiliation and made threats to the officer and spouse ("you're both going to burn in hell").

37. Between February 1-10, 2026, another deportation officer in Maryland reported a doxing incident in which an unknown subject disclosed on the officer's wife's Facebook page that she is married to an ICE agent.

38. On August 16, 2026, an ERO Washington/Baltimore deportation officer's social media accounts were doxed online. The doxing incident listed officer's specific personal identifiable information regarding the officer's professional affiliation and spouse.

39. On September 16, 2026, a deportation officer conducted surveillance in Hyattsville, MD attempting to apprehend an illegal alien. During that morning surveillance, an agitator who lived in an apartment unrelated to the suspect, was outside filming our vehicles. While the agitator was filming, he went right up to our vehicles almost putting his phone on the windows to see inside the vehicles. The agitator filmed videos of himself berating the officers while showing the officers inside the vehicles and saying things like he is going to make sure "we" don't "get" anybody. The agitator said he would post the videos on TikTok. The officer proceeded to check TikTok on his personal phone to see any truth to the claims, and with a simple search of "Hyattsville ICE," the two videos with ICE officers were found.

40. Wearing facial coverings or otherwise protecting the personal identities of immigration officers can be essential to mitigating the above kinds of threats. That is, facial coverings reduce the risk of officers' personal identities being shared publicly, which helps ensure that officers' privacy and safety, and that of their family members, remains intact. Protecting officers' personal identities is particularly important during high-risk enforcement operations involving individuals with violent criminal history, including gang affiliations, or who are associates or members of transnational criminal organizations or known or suspected terrorists or human rights violators.

41. Facial coverings are also an important tool to protect officers from unpredictable health and safety hazards that arise during enforcement activities. Wearing facial coverings can minimize exposure to these, and other types, of health hazards. ICE officers should therefore have the ability to prepare themselves for these hazards at any time during any law enforcement operation, irrespective of whether the operation is an active undercover operation, a tactical operation, or whether an operation is occurring in exigent circumstances. Moreover, ICE policy permits personnel to use any facial covering they feel is appropriate to meet operational needs and to protect them from health hazards.

42. In addition to mitigating safety risks, protecting the personal identities of federal immigration officials is necessary for operational purposes to effectively accomplish DHS's immigration enforcement mission.

43. For instance, ICE routinely conducts investigations and surveillance in plain clothes to locate and apprehend illegal aliens, particularly in public or community areas where targets may attempt to evade detection. Maryland's attempt to require ICE officers and agents to wear visible identification including a name tag or badge would compromise operational security

by alerting targets to the presence of law enforcement, thereby increasing the likelihood of flight, heightening the potential for volatile and dangerous confrontations.

44. The visible identification requirement of the officers to the public and subjects of arrest, holding, or detention, as well as requiring vehicle identification would therefore undermine ICE's ability to apprehend individuals who pose significant risks to national security and public safety, which further jeopardizes the safety of officers, the public, and targets themselves.

45. Facial coverings also prevent suspects from identifying officers who may be involved in future enforcement actions. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, wearing facial coverings is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent.

46. Given the personal threats and violence that ICE officers/agents face, denying them the opportunity to protect their identities by not displaying their names and wearing facial masks would chill federal law enforcement operations. Moreover, the threat of a state criminal prosecution will also chill officers and thus federal operations.

47. The inability to conceal officers' identities during enforcement actions thus compromises DHS's mission and increases the likelihood of targeted violence against its officers and agents.

48. Collectively, these measures severely constrain ICE's ability to protect communities within the state of Maryland and undermine the effectiveness of federal immigration enforcement in not only Maryland, but the surrounding region at large.

49. Maryland Senate Bill 1, Prince George's County Council Bill CB-008-2026, and Montgomery County Council Bill 5-26's provisions on facial coverings and identification hinder

ICE's ability to conduct efficient and effective immigration enforcement within Maryland.

50. ICE has no intention of complying with Maryland Senate Bill 1, Prince George's County Council Bill CB-008-2026, and Montgomery County Council Bill 5-26.

51. This declaration is based upon my personal knowledge and information made available to me in my official capacity. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case. If called upon to testify, I could and would do so.

Executed this 30th day of September 2026.

NIKITA M BAKER

Digitally signed by NIKITA M BAKER
Date: 2026.09.30 12:27:30 -04'00'

Nikita Baker
Deputy Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security