# Ex. D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF MARYLAND, 100 State Circle, Annapolis, MD 21401,

ANTHONY BROWN, Attorney General of the State of Maryland, in his Official Capacity, 200 St. Paul Place, Baltimore, MD 21202,

MARYLAND POLICE TRAINING AND STANDARDS COMMISSION, 6852 4th Street, Sykesville, MD 21784, Sykesville, MD 21784,

PRINCE GEORGE'S COUNTY, MD, 1301 McCormick Drive, Largo, MD, and

MONTGOMERY COUNTY, MD, 101 Monroe Street, Rockville, MD 20850,

Defendants.

No. 1:26-cv-04110-JRR

**DECLARATION OF JUSTIN HARGIS**

I, Justin Hargis, based upon my personal knowledge and information made known to me in the course of my employment, hereby declare as follows:

1. I am employed by U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP's central mission is to keep terrorists and their weapons out of the United States while facilitating lawful international travel and trade.

2. CBP's Office of Professional Responsibility (OPR) supports CBP's mission by ensuring compliance with agency-wide programs and policies relating to corruption, investigating allegations of criminal and other misconduct, and executing CBP's internal security and integrity awareness programs. OPR's work includes identifying suspicious activity through data analysis, investigating criminal or serious misconduct allegations, ensuring employees maintain the highest

standards of integrity and professionalism, and taking measures to protect CBP employees, facilities, and sensitive information from security threats.

3. I am the acting Executive Director for the Investigative Operations Directorate (IOD) within OPR located in Washington, D.C. In this role, I oversee over 500 criminal investigators who are charged with investigating criminal and administrative misconduct of CBP employees and contractors, reviewing use of force incidents, and investigating reported threats to employees, doxxings involving employees, and related crimes.

4. Prior to entering on duty with OPR, I was a United States Border Patrol (USBP) Agent for twelve years, serving in various agent/management positions. I entered on duty with OPR on May 30, 2018, as a Special Agent. In this position, I performed the functions of a criminal investigator to include reviewing completed investigations to ensure investigative sufficiency and mentoring subordinates. In January of 2021, I was promoted to the Resident Agent in Charge of the Del Rio OPR Office. In this position, I oversaw all OPR operations within the Del Rio, Texas area of responsibility. In July of 2022, I was promoted to the position of Special Agent in Charge of the Washington D.C. Field Office. I have been acting as the Executive Director of IOD since June 1, 2026.

5. I submit this declaration in support of Plaintiff's complaint and motion for preliminary injunction in the above-captioned case and to describe recent documented threats against CBP personnel. This declaration is based upon my personal knowledge and information made available to me in my official capacity. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry into the above-captioned case.

**CBP Officers and Agents Face Heightened Risk of Doxxing and Other Threats**

6. CBP, including OPR, has received a marked increase in reports of threats against law enforcement agents and officers and other CBP employees since January 2025 associated with increased operations and the public's perception of CBP's involvement in ongoing DHS enforcement initiatives. Publicly available data show that there was a significant increase in reported assaults on CBP officers and agents within the past fiscal year (FY), with 856

officers/agents assaulted in FY2025 compared to 457 in FY2024, and 1,343 officers/agents assaulted in FY2026 as of August.[1] Threats against CBP employees have also increasingly taken the form of posts and messages on social media, in group chats, and elsewhere that reveal personally identifiable information (PII) of CBP employees such as home addresses and personal phone numbers. This public disclosure of PII, known as doxxing, constitutes a threat to employee safety and is often coupled with language conveying express or implied threats of harm to that employee or his or her family. Doxxing can lead to harassment, intimidation, and other harms, and is considered a serious violation of privacy, particularly when targeting government employees whose jobs necessarily place them in the public arena, and who often do not have a choice about when and where they must perform job-related duties.

7. Modern technology has made it easier for bad actors to find and widely distribute personal information about officers, agents, and other CBP employees conducting their assigned duties and to use this information or encourage others to use it to target CBP employees. These actors seek to intimidate CBP employees and interfere with their ability to carry out CBP's mission. There are social media sites dedicated to posting pictures of USBP agents and officers seeking to identify them and obtain their personal information. Likewise, I am aware through both media and agency reporting that CBP personnel have had their photos posted online without their consent, some accompanied by the individuals' PII including names or license plate numbers.

8. To address the serious safety concerns posed by these threats, and in particular doxxing of CBP employees, CBP has analyzed how to best protect its workforce, issued messaging on cyber hygiene, and realigned resources to address recent upticks in doxxing and other threat-related incidents.

9. CBP, and OPR specifically, are aware of numerous doxxing incidents across the nation that support the need to protect CBP employee identities from disclosure, particularly where these employees are involved in DHS enforcement initiatives, such as interior operations. Since

[1] CBP Assault and Use of Force Dashboards, available at: https://www.cbp.gov/newsroom/stats/assaults-use-force (last viewed Sept. 29, 2026).

December 2025, OPR's central clearinghouse for reporting, CBP Intake, has received reports of over 200 instances of threats and doxxings targeting CBP employees. Examples of recent, substantiated doxxing and other concerning events from across CBP include the following.

a. In January 2025, an off-duty agent received a chat application message containing a photo of his own home accompanied by the following threatening message: "Ese ya agarró la mayoría le toca Descanso" (which roughly translates to "He already got the majority, it's his turn to rest").

b. In June 2025, a USBP agent supporting the Los Angeles-based Operation At Large had his personal phone number, current address and his parents' address published online, and his family received several threats alluding to his official position. Text messages sent to the agent included: "I'm going to kill you when I see you bitch" and "Your family and everyone is gonna be targeted ! Be ready [*sic*]".

c. In June 2025, an unknown individual posted the social media profile of an Office of Public Affairs (OPA) employee to Reddit with the caption, "Agent Identified." Subsequent commentors replied, "Is that his phone number next to his name?" and "Where are his videos?" The employee subsequently received an email from an anonymous email account to his official CBP email address with the subject, "You're a piece of shit." In October 2025, the OPA employee's information was added to the website, ICElist.is. The OPA employee is not a law enforcement officer.

d. In June 2025, outside of Los Angeles, California, violent extremists posted on Instagram the address of a hotel where USBP agents were staying, prompting another user to respond: "Burn them" and another to reply, "Got a match".

e. In July 2025, an individual posted a picture of a Chief Patrol Agent (CPA) to social media accompanied by the statement "Assignment time: What can we find out about this mfr?", to which another individual responded with the CPA's home address. Replies included, "Gonna end up like your boy on the news" and "Who's car are we taking?????? [*sic*]". In response to these and other threats, OPR determined it

was necessary to provide a 24-hour security presence for the CPA and members of his family.

f. In July 2025, USBP's Miami Sector reported that an agent was surrounded by six to eight civilians while assisting with a vehicle stop. The agent asked the civilians to step back and all but one did. The remaining subject shouted the agent's name and threatened to dox him. After the subject was arrested and while in transit, the subject made statements indicating his familiarity with the agent's schedule and mentioned the names and personal information of other agents.

g. In August 2025, an Instagram page posted photos of a USBP agent operating in Los Angeles with the bold heading: "WARNING: SUSPECTED KIDNAPPER/TERRORIST" and personal details about the agent, including his full name, and the purported town of his residence and his hometown. In October 2025, in similar fashion, the same Instagram page posted several images of a USBP agent working in California—including pictures of his face when conducting his official duties, his nameplate, and his purported town of residence and hometown, again with the bold header: "WARNING: SUSPECTED KIDNAPPER/TERRORIST".

h. In October 2025, the online hacking group known as "SCATTERED LAPSUS$ HUNTERS" released the personal and official information of 680 DHS employees (including 212 current or former CBP employees), approximately 190 Department of Justice employees, and 170 FBI employees. The release included names, office locations, email addresses, phone numbers, and, in some cases, home addresses or personal phone numbers. Following the release, members posted on the group's Telegram channel derogatory comments such as "I want my MONEY MEXICO" and "Mexican Cartels hmu [hit me up] we dropping all the doxes wheres my 1m [1 million dollars] [*sic*]".

i. In October 2025, in Houlton, Maine, a USBP Acting Division Chief's service vehicle was photographed and the photo was posted on Facebook with the

caption: "UNMARKED ICE VEHICLE, Be on the lookout for this unmarked car or personal vehicle of this ICE agent" with the license plate number included.

j. In November 2025, a video of a USBP Agent in uniform supporting Operation at Large was posted on social media. Subsequently, the agent received a message saying that he was a "dead man." Additionally, he received threatening messages claiming that his information was all over the internet, his family was in danger, and he would be hung with the other "[N]azi scum".

k. In January 2026, names and phone numbers of CBP's resiliency and peer support teams were leaked and widely disseminated on social media. In response, posters on social media said: "Why are ya'll [sic] redacting the phone numbers?"; "I suggest these people be visited at night by masked individuals with firearms."; and "So easy to find Green Bay guy's address with a simple search." Local police increased patrols near the referenced officer's residence and FBI agents conducted spot checks of the residence in response to the social media posts.

l. In January 2026, a USBP Agent who supported Operation at Large received threatening social media messages along with an image of his child. Another USBP Agent reported individuals driving by his house and taking photos.

m. In March 2026, names and official email addresses for an estimated over 14,000 CBP and ICE employees were posted on a blog. Some of these entries contained personal phone numbers and home addresses. These email addresses, personal phone numbers, and home addresses were posted on an anarchist website which contained guides on how to make incendiary devices and how to commit arson attacks on federal facilities while avoiding detection. The website also contained a guide to specific government infrastructure, including ingress and egress points of buildings.

n. In July 2026, a Supervisory Border Patrol Agent assigned to Las Cruses, New Mexico, reported receiving harassing text messages from a phone number he did not recognize. One of the messages said in part "…you need to be eradicated." This

Supervisory Border Patrol Agent had reported receiving unwanted calls in January and February 2026, including one in which he was told to kill himself.

10. Additionally, CBP is aware of a website called "ICElist.is". This site, hosted on foreign servers, claimed to be "an open journalistic project … aimed at collecting and sharing information that can hold ICE members legally accountable" and referred to authorized law enforcement activity as "kidnapping" and "racist abduction". The website published personal information of DHS law enforcement officials. In June 2026, when CBP attempted to access "ICElist.is", the request redirected to a website named "theICElist.org" ("ICE List Wiki"). This website published personal information and photos of DHS personnel. As of at least July 22, 2026, "ICElist.is" appears to have been removed.

11. However, websites icedox.net ("ICE Index") and the ICE List Wiki are both active websites as of September 29, 2026. The ICE Index website includes the following on the "Contribute" page: "Doxxes should be as detailed as possible, but they need to include the following information: Full name, date of birth, address, phone number, a description of the agent, and links to where you got the information from." The ICE Index contains names, photos, and information of purported DHS personnel, even including maps of the listed addresses.

12. The ICE List Wiki has posted names and photos of purported CBP employees, as well as links to personal social media accounts for at least one purported CBP employee. As of September 29, 2026, the website boasts "1,791 agents identified" and "1,196 vehicles tracked." Additionally, the website for this digital media organization maintains a gallery of images of so-called Most Wanted officers and agents that have not yet been "identified". The website encourages visitors to submit evidence (photos, videos, social media posts) to verify the identities of these "Most Wanted" or submit information about officers and agents that have not yet been posted to the website. The ICE List Wiki was created by an independent digital media organization that posted a video of a Border Patrol Agent (BPA) assigned to Operation at Large on social media without a face covering. Multiple threats against the BPA and his family followed this video posting.

13. In sum, CBP employees are facing significant and pervasive threats as they perform their assigned duties. While CBP has taken, and continues to take, concrete steps to mitigate these threats, a critical element to avoiding harm to CBP employees is to ensure their identities are protected from public release—particularly in the context of ongoing enforcement operations that are the subject of controversy among members of the public. It has been my experience that doxxing events have significantly increased since January 2025. It is important to note that threats have been directed towards all levels of CBP employees, to include the level of CPA.

14. Consistent with federal law, in certain circumstances, CBP permits its officers or agents, in limited and specific circumstances, to wear facial coverings and remove visible identifying information from their uniforms. CBP leadership has authorized its personnel to wear facial coverings, which may include eye protection, facial masks, or a combination of both. Such uniform modifications have been authorized when the risk of doxxing to officers and agents is likely. Additionally, CBP has permitted officers and agents to remove nameplates, badges, and unique identifiers from their uniforms, both in response to similar concerns for safety and as part of day-to-day operations, including but not limited to undercover, plainclothes, and certain investigative operations. These modifications have been authorized for officers and agents throughout CBP's history when determined to be operationally appropriate and necessary. CBP also utilizes unmarked vehicles in furtherance of these types of operations and in accordance with federal law and policy.

15. CBP personnel are accustomed to performing their assigned duties in a public setting, which sometimes means facing public scrutiny. However, the rise of doxxing, the advancement of facial recognition technologies, and the proliferation of bad actors on social media, has created an unprecedented operational risk for federal law enforcement officers. I am aware that officers and agents have expressed concerns about being doxxed when performing their assigned duties and worry about their personal safety and the safety of their families. Permitting officers and agents to cover their faces or remove visible identifying information from their uniforms helps to reduce the risk of doxxing by limiting the ability of facial recognition technology to identify the

officer or agent and by reducing the likelihood that the officer or agent's full name and other identifying information will be discovered by those seeking to dox CBP personnel.

**Maryland State and Local Laws Prohibiting the Use of Face Coverings and Requiring Law Enforcement Officers Provide Identification in the Performance of Official Duties**

16. I am aware of Maryland Senate Bill 1 (SB1), which provides that unless State-defined exceptions apply, law enforcement, including federal law enforcement, may not wear face coverings while performing their duties in the state and must wear identification on their outermost clothing (i.e., agency or department, last name, and badge number or identification number). Law enforcement officers operating in the state are further required to verbally identify themselves upon request. A violation of the law is a civil offense.

17. I am aware of Montgomery County Code, Chapter 25, Section 35-13E, which prohibits law enforcement, including federal law enforcement, from wearing face coverings while operating in the County and requires law enforcement to wear identification (i.e., agency or department, last name, and badge number or other identification number) while on duty unless certain state-defined exceptions apply. A violation of the law is a civil offense.

18. I am aware of Prince George's County Code, Chapter 5, Section 18-124, which provides that law enforcement officers, including federal law enforcement officers, shall not wear a face covering while interacting with a member of the public in the performance of official duties and shall display the officer's name and identification number without obstruction, unless certain state-defined exceptions apply. A violation of the code is a misdemeanor criminal offense.

**Impact on CBP Operations**

19. These laws interfere with CBP's discretion to authorize the use of certain uniform modifications like facial coverings and removal of visible identification in situations where it is operationally necessary. Subject only to certain limited exceptions, the laws would require officers and agents to wear identifying information about themselves, including their last names, and prohibit them from wearing face coverings, while performing their federal law enforcement functions in the State of Maryland.

20. These provisions undermine the safety of CBP officers and agents. A law enforcement officer in violation of Maryland's SB1 or Montgomery County's law is guilty of a civil offense and on conviction is subject to a fine not exceeding $1,500. A law enforcement officer in violation of the Prince George County law is guilty of a misdemeanor criminal offense and upon conviction, subject to imprisonment not to exceed (6) months and fine up to a $5,000. Subjecting officers and agents to potential civil and criminal enforcement actions for making these uniform modifications or announcing their identity will also disincentivize them from taking critical measures to protect themselves against an unprecedented threat. This, in turn, creates a strain on CBP's already stretched manpower. When personnel are doxxed, the agency sometimes must expend valuable resources responding to threats or providing additional protection for its personnel. These resources could otherwise be used to fulfill CBP's primary mission.

21. The law will also harm CBP operations and its ability to perform the mission effectively. Such uniform modifications may be operationally necessary when conducting investigative or protective activities, for example. If images of a CBP officer or agent's face become widely distributed, then that officer or agent will be less safe and effective when conducting surveillance, plainclothes operations, or undercover operations. Revealing an officer's personal identity and/or agency affiliation could also enable subjects under investigation to circumvent detection, which is precisely what many surveillance and plainclothes operations are intended to avoid.

22. Although the Maryland state and local laws appear to provide certain exceptions to the facial covering and identification provisions, determinations about whether and when to display or produce identification and use facial coverings should be made by CBP, not by the Maryland state and local laws. CBP is the only authority equipped with the information and expertise necessary to decide whether and when significant and widespread safety and operational considerations faced by its agents and officers warrant allowing uniform modifications for its personnel.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on September 29, 2026.

JUSTIN W HARGIS
Digitally signed by JUSTIN W HARGIS
Date: 2026.09.29 19:34:40 -04'00'

Justin W. Hargis
Acting Executive Director, Investigative Operations Directorate
Office of Professional Responsibility
U.S. Customs and Border Protection