**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF MARYLAND, et al.,<br><br>Defendants. | ) | Civil Action No. 1:26-cv-04110-JRR |

**DEFENDANT PRINCE GEORGE'S COUNTY, MARYLAND'S MOTION TO DISMISS COUNT II OF THE COMPLAINT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF No. 2)**

Defendant Prince George's County, Maryland (the "County"), by undersigned counsel, moves under Federal Rule of Civil Procedure 12(b)(1) and, in the alternative, Rule 12(b)(6) to dismiss Count II of the Complaint (ECF No. 1), files this Opposition to Plaintiff's Motion for Preliminary Injunction (ECF No. 2), and in support thereof states as follows:

## I. INTRODUCTION

The United States is suing Prince George's County over a County law that State law displaced on October 1, 2026—the day this action was filed. As of that date, Maryland law forbids any county policy on face coverings or identification other than the uniform policy of the Maryland Police Training and Standards Commission (the "MPTSC"). Md. Code Ann., Pub. Safety § 3-207(p)(3), (q)(3). The MPTSC adopted that policy on September 2, 2026, with an implementation date of October 1, on a motion for which the Special Agent in Charge of the FBI's Baltimore Field Office voted. He holds his MPTSC seat by virtue of that office, Pub. Safety § 3-203(a)(5), and is, in his own words, "responsible for the management and operations of the FBI in Maryland and

Delaware." Paul Decl. ¶ 1 (ECF No. 2-3); Ex. 2 (Md. Police Training & Standards Comm'n, Attendance & Voting Records (Sept. 2, 2026)); Ex. 5 (Certified Tr. of MPTSC Sept. 2, 2026 Open Session) at 3:15–17, 42:14–17, 43:22–24; Md. Police Training & Standards Comm'n, *Police Training & Standards Commission Meeting (Sept. 2, 2026)*, MarylandPCTC, YouTube (uploaded Oct. 15, 2026), https://www.youtube.com/watch?v=CoK-5dNP8Zc (vote at 50:08–50:11) (last visited Oct. 26, 2026) ("Recording").

Twenty-two days after that vote, he signed a declaration "in support of the United States' claims and motion for a preliminary injunction." Paul Decl. ¶ 3. The declaration does not mention the vote.

Since October 1, 2026, the State's uniform policy on face coverings and identification by law enforcement officers has been the only one Prince George's County may have.

On October 1, 2026, the United States filed this action and moved for a preliminary injunction. ECF Nos. 1, 2. Count II pleads that § 18-124 violates the Supremacy Clause as an "Unlawful Regulation of the Federal Government." Compl. ¶¶ 83–87. The United States seeks a declaration that the County law is "invalid as to federal law enforcement officers" and an injunction against "implementing and enforcing" it "against federal law enforcement officers." Compl., Prayer for Relief ¶¶ A–B; *see* ECF No. 2 at 1.

In April 2026, while the General Assembly was considering the statewide bill, the County Council enacted § 18-124. The Council's committee report records that "the State is expected to pass similar legislation." ECF No. 1-4 at 9. In fact, the State did pass such legislation. The law the Governor signed on May 26, 2026 directs the MPTSC to develop "a uniform policy, to be used by each law enforcement agency," and provides that "[a] county, a municipality, or a law enforcement agency of the State or a political subdivision of the State may not adopt a policy,

other than the uniform policy developed by the Commission," on face coverings or identification. Pub. Safety § 3-207(p)(2)–(3), (q)(2)–(3). Since October 1, 2026, § 18-124 has been displaced by State law, and every law enforcement officer in the County—federal, State, and local—has been governed by State law and no other.

In the five months the County law was operative, no federal officer was cited, arrested, charged, or prosecuted under it. Indeed, before enactment the County's own Police Department told the Council that it "will not be able to enforce this on another police department or a federal agency." ECF No. 1-4 at 13. The County will initiate no enforcement under § 18-124 against any federal officer, for conduct before October 1 or after. Ex. 3 ¶ 6. There is nothing for an injunction to restrain and nothing for a declaration to decide. Count II should be dismissed, and the motion for a preliminary injunction should be denied as to the County.

The County asks the Court to dismiss Count II now. If the Court is not prepared to do so, it should defer any ruling on the merits until the Fourth Circuit decides *United States v. Virginia*, No. 26-1874, which presents informative questions and is set for argument on October 27, 2026. And if the Court reaches the merits, the County adopts the State Defendants' defense of the State law to the extent it applies to § 18-124.

## II. STATEMENT OF THE CASE

*The County Law*

The County Council enacted Council Bill CB-008-2026 on April 7, 2026, by a vote of 11 to 0. The bill became law without the County Executive's signature on April 29, 2026, and took effect that day, repealing and reenacting § 18-124 of the County Code. ECF No. 1-4 (Compl. Ex. C) at 2–7. The section applies to every "Law Enforcement Officer," defined as "an individual who is: (A) A sworn member of a law enforcement agency; and (B) acting in the performance of official

duties." § 18-124(a)(2). "Law Enforcement Agency" means "a federal, state, or local agency, department, bureau, office, or unit authorized to enforce criminal, civil, or immigration laws in the County." § 18-124(a)(1). The section has two operative rules: "a law enforcement officer shall not wear a face covering while interacting with a member of the public in the performance of official duties in Prince George's County," § 18-124(b)(1), and "a law enforcement officer shall display the officer's name and identification number issued by the law enforcement agency who they represent without obstruction," § 18-124(b)(2).[1] The face-covering rule has exceptions for undercover operations, tactical operations, medical masks, fire and smoke gear, protection against biological or chemical agents, water rescue, vehicle helmets, and coverings worn for warmth in inclement weather. § 18-124(c). A violation is a misdemeanor punishable by imprisonment of up to six months and a fine of up to $5,000. § 18-124(d). The committee report describes the Act's goal as "to prevent impersonation and promote accountability with all law enforcement officials operating in Prince George's County," and records Council Member Fisher's advice that "Prince George's County law enforcement does not wear masks except under special circumstances. This would require ICE to follow our standards, and the State is expected to pass similar legislation." ECF No. 1-4 at 8–9.

*The County's Record before Enactment*

The County Police Department advised the Council before enactment that it "will not be able to enforce this on another police department or a federal agency," and that "County Police Officers cannot interfere in a federal agent/officer's performance of their duties." ECF No. 1-4 at 13. The Office of Law identified a "legal impediment" to applying the bill to federal agents, noted

[1] The Complaint alleges that § 18-124 also requires federal officers to "provide verbal identification." Compl. ¶ 85. It does not. *See* § 18-124(b).

that the General Assembly was considering legislation requiring the MPTSC to develop a policy for agencies operating in the State, and suggested that "[p]erhaps the County can align its efforts with policies adopted by the Commission." *Id.* at 10–11. The United States attaches both comments to its Complaint and relies on the Office of Law's comment and the committee report. Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Mem.") 10 (ECF No. 2-2).[2]

*The State Law and the MPTSC's Policy*

On May 26, 2026, the Governor approved 2026 Md. Laws ch. 612, effective October 1, 2026. ECF No. 1-2 (Compl. Ex. A) at 2, 12. The Act directs the MPTSC to "develop a uniform policy, to be used by each law enforcement agency," prohibiting face coverings and requiring identification. Pub. Safety § 3-207(p)(2)(i), (q)(2)(i). It provides, in each subsection, that "[a] county, a municipality, or a law enforcement agency of the State or a political subdivision of the State may not adopt a policy, other than the uniform policy developed by the Commission," regarding the use of face coverings by, or requiring the use of identification by, law enforcement officers. *Id.* § 3-207(p)(3), (q)(3) (ECF No. 1-2 at 3–5).[3]

The Act's substantive provisions apply to every law enforcement officer in the State. Section 3-535 provides that an officer "may not wear a face covering while in the performance of duty in the State, except as authorized in the uniform policy adopted by the Maryland Police Training and Standards Commission." *Id.* § 3-535(c). Section 3-536 requires an officer to wear identification on the outermost layer of clothing and to disclose it verbally on request. *Id.* § 3-536(c). A violation of either section is a civil offense enforced by citation. *Id.* §§ 3-535(d)–(e),

---

[2] Citations to "Pl.'s Mem." are to the internal page numbers of ECF No. 2-2.
[3] This memorandum cites §§ 3-535 and 3-536 as numbered in the enacted bill, 2026 Md. Laws ch. 612 (ECF No. 1-2), and as cited in the Complaint, the Motion for Preliminary Injunction, and the United States' declarations. As codified, those sections appear at Pub. Safety §§ 3-536 (face coverings) and 3-537 (identification). Sections 3-207(p) and (q) were not renumbered.

3-536(d)–(e). The MPTSC's published policy states that it was "Adopted by the Police Training and Standards Commission, September 2, 2026," with an effective date of October 1, 2026. Ex. 1. It prohibits face coverings, *id.* § IV, requires identification, *id.* § V, and directs that "[a] law enforcement agency operating at the state, county, or municipal level in Maryland must implement the Face Coverings and Identification Uniform Policy published by the Maryland Police Training and Standards Commission," *id.* § VII.D. The posted policy also bears the notation "Revised October 7, 2026"; the revision consists of two editor's notes that substitute the codified section numbers and correct a citation to the Code of Maryland Regulations, and the adoption and effective dates and operative provisions are unchanged. *Id.* at [1]; *see* State Defs.' Mem. at 6 (dating the adoption to September 2, 2026). The MPTSC adopted the policy at its September 2, 2026 open session, on a motion that set October 1 as the implementation date. Ex. 2 (Md. Police Training & Standards Comm'n, Attendance & Voting Records (Sept. 2, 2026)); Ex. 5 (Certified Tr. of MPTSC Sept. 2, 2026 Open Session) at 35:3–7, 41:8–13, 42:14–17, 44:4–7; Recording at 48:54–50:34. The Special Agent in Charge of the FBI's Baltimore Field Office, a statutory member of the MPTSC, Pub. Safety § 3-203(a)(5), voted for the motion. Ex. 2; Ex. 5 at 43:22–24; Recording at 50:08–50:11; *see* State Defs.' Mem. at 6 n.4 (noting the vote).

*The County's Position*

The County's position, stated by declaration of the County Attorney, is that since October 1, 2026, Pub. Safety § 3-207(p)(3) and (q)(3) have barred the County from having any policy on face coverings or identification by law enforcement officers other than the MPTSC's; that § 18-124 has been displaced by State law and is of no effect; and that the County will take no action to enforce § 18-124 against any law enforcement officer. Ex. 3 (Decl. of Anthony D. Jones, County Attorney) ¶¶ 5–6, 8. In the five months between April 29 and October 1, 2026, no federal law

enforcement officer was cited, arrested, charged, or prosecuted under § 18-124. Ex. 4 (Decl. of George R. Nader, Chief of Police) ¶¶ 5–6. The County will initiate no citation, arrest, referral, or charge under § 18-124 against any federal law enforcement officer for conduct that occurred before October 1, 2026, and the County will not invoke any savings provision of County or State law that could be read to preserve liability for such conduct. Ex. 3 ¶¶ 6–7. [The State's Attorney for Prince George's County, who shares authority to enforce § 18-124, has received no referral of and filed no charge against any federal law enforcement officer under § 18-124, and will file none. Ex. 6 (Decl. of [Name], State's Attorney) ¶¶ 5–6.]

*The United States' Papers*

The Complaint pleads that § 18-124 "ha[s] already taken effect" and that enforcement "is certainly impending." Compl. ¶ 73. It alleges no citation, arrest, charge, or prosecution of any federal officer in the five months the County law was operative. It does not mention Pub. Safety § 3-207(p)(3) or (q)(3), although it attaches the chapter law that contains them. The four declarations filed with the motion, from the Federal Bureau of Investigation's Baltimore Special Agent in Charge (ECF No. 2-3, "Paul Decl."), the Drug Enforcement Administration (ECF No. 2-4, "Allen Decl."), an Immigration and Customs Enforcement Deputy Field Office Director (ECF No. 2-5, "Baker Decl."), and U.S. Customs and Border Protection (ECF No. 2-6, "Hargis Decl."), describe no operation in Prince George's County cancelled, delayed, or altered because of the County law and no County officer who has attempted to enforce it. None attaches, quotes, or identifies by title, date, or number a written federal policy, directive, or order on face coverings or identification. Three declarants state that their agencies will not comply with the challenged laws or will not require their agents to do so. Paul Decl. ¶ 18; Allen Decl. ¶ 26; Baker Decl. ¶ 50. The one Maryland incident described in detail occurred in Hyattsville on September 16, 2026: during

a surveillance, a man filmed ICE vehicles, recorded himself "berating the officers while showing the officers inside the vehicles," and posted two videos. Baker Decl. ¶ 39. The declaration does not say that the officers left their vehicles, spoke to him, or were unmasked.

## III. ARGUMENT

### A. COUNT II SHOULD BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE STATE LAW DISPLACED § 18-124 ON THE DAY THIS ACTION WAS FILED.

The United States lacked standing when it filed this action on October 1, 2026. Standing is measured when the complaint is filed, and by October 1, State law barred the County from maintaining or enforcing any policy on face coverings or identification other than the MPTSC's uniform policy. Section 18-124 therefore posed no credible threat of enforcement when this action began. Because the United States then faced no concrete injury traceable to the County that prospective relief could redress, Count II must be dismissed for lack of subject-matter jurisdiction. Mootness provides an alternative ground for dismissal only if the Court concludes that standing existed at filing.

Article III extends the judicial power only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. That limit is jurisdictional: "[f]ederal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (per curiam). Standing is part of the same limit; its core is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Both standing and mootness therefore go to the Court's subject-matter jurisdiction and are raised under Rule 12(b)(1). *See S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185

(4th Cir. 2013); *Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554, 564 (4th Cir. 2024).

Standing is measured when the action is filed, asking whether the plaintiff had "the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008). A plaintiff who challenges a law before it is enforced must show "a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). If jurisdiction attached at filing, mootness asks whether a later event eliminated the controversy. A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021) (quoting *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017)), and "the proper disposition of moot claims is to dismiss them for lack of jurisdiction," *Adams Outdoor*, 105 F.4th at 564. The distinction matters, because the two doctrines place the burden differently and have different exceptions. A defendant "claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," but "it is the plaintiff's burden to establish standing." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). And "[s]tanding admits of no similar exception" for disputes capable of repetition yet evading review. *Id.* at 191.

The United States bears the burden of establishing standing as of the date it sued. *Lujan*, 504 U.S. at 561; *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). On a factual challenge, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)); *see*

*Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). The Court may therefore consider Exhibits 1 through 5 in deciding this motion. The MPTSC's published policy is posted on the MPTSC's official website, Ex. 1, and the archived recording of its September 2, 2026 open session is published on the MPTSC's official YouTube channel and embedded on the MPTSC's webpage, Recording. Both are public records of which the Court may take judicial notice, Fed. R. Evid. 201(b)(2); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009), and self-authenticating official publications, Fed. R. Evid. 902(5); *see Williams v. Long*, 585 F. Supp. 2d 679, 692 (D. Md. 2008). Under Maryland's Open Meetings Act, the archived recording of an open session is deemed the minutes of that session. Md. Code Ann., Gen. Provis. § 3-306(b)(2)(i), (b)(3). Exhibit 2 is the MPTSC's attendance and voting record for that session, which records each member's vote, and Exhibit 5 is a certified transcript of that session (Veritext Legal Solutions, Oct. 22, 2026), cited by page and line; citations to the Recording are by timestamp. If the Court "determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action," Fed. R. Civ. P. 12(h)(3), and the dismissal must be without prejudice, *S. Walk*, 713 F.3d at 185.

**1.** The United States lacked standing when it filed because State law had displaced § 18-124.

Maryland law resolves a conflict between a county law and a State law in the State's favor. A charter county's local laws are subject to the public general laws: "in case of any conflict between said local law and any Public General Law now or hereafter enacted the Public General Law shall control." Md. Const. art. XI-A, § 3. The General Assembly wrote the same limit into the grant of county powers: a county "may exercise the powers provided under this title only to the extent that the powers are not preempted by or in conflict with public general law." Md. Code Ann., Local Gov't § 10-206(b). State law may preempt local law "in three ways: express preemption, preemption by conflict, and implied preemption." *Engage Armament LLC v.*

*Montgomery County*, No. 9, Sept. Term 2025, slip op. at 20 (Md. Apr. 28, 2026) (citing *Talbot County v. Skipper*, 329 Md. 481, 487–88 (1993)). "Express preemption occurs when the General Assembly prohibits local legislation in a field by specific language in a statute." *Id.* (quoting *Worton Creek Marina, LLC v. Claggett*, 381 Md. 499, 512 n.6 (2004)). An ordinance is preempted by conflict "when it prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." *Skipper*, 329 Md. at 487 n.4. And State law preempts by implication where the General Assembly has occupied the field; "[t]he primary indicia of a legislative purpose to preempt an entire field of law is the comprehensiveness with which the General Assembly has legislated in the field." *Howard County v. Potomac Elec. Power Co.*, 319 Md. 511, 523 (1990) (quotation omitted).

Maryland's highest court has applied these rules to both of the counties sued here. In *Engage Armament*, decided this year, the governing statute provides that, except as the statute itself allows, "the State preempts the right of a county" to regulate firearms. Md. Code Ann., Crim. Law § 4-209(a). The Court held that any Montgomery County provision falling outside the statute's limited authorization "is expressly preempted," and it held specific provisions of the County Code preempted on that basis. *Engage Armament*, slip op. at 29, 37, 41. In *Altadis U.S.A., Inc. v. Prince George's County*, 431 Md. 307 (2013), the Court held two of this County's laws regulating the sale of cigars impliedly preempted, because the State had comprehensively regulated the packaging and sale of tobacco products. Each theory independently displaces § 18-124.

**a. *Express preemption***

Here, the State law is express and direct. "A county, a municipality, or a law enforcement agency of the State or a political subdivision of the State may not adopt a policy, other than the uniform policy developed by the Commission, regarding the use of face coverings by law

enforcement officers," and the same for a policy "requiring the use of identification by law enforcement officers." Pub. Safety § 3-207(p)(3), (q)(3). Two features of the provision put § 18-124 within it. First, it names "a county" separately from "a law enforcement agency of . . . a political subdivision of the State," so it reaches county law and not only departmental directives. Reading "policy" to mean only an agency's internal rules would leave the words "a county" with nothing to do. Second, the uniform policy is not advisory. Every agency "operating at the state, county, or municipal level in Maryland must implement" it, Ex. 1 § VII.D, and the Commission's Executive Director told the members on September 2 that the policy "has the force and effect of the law as a regulation would" and "is being adopted verbatim by every law enforcement agency," Ex. 5 at 25:19–26:7, and the State's substantive provision governs every officer "in the performance of duty in the State, except as authorized in the uniform policy," Pub. Safety § 3-535(c). A county law on the same subjects, with its own exceptions and its own penalty, is therefore "a policy, other than the uniform policy," and the County "may not adopt" it. The policy's allowance for "[a]n agency" to "supplement this policy with more restrictive local uniform standards," Ex. 1 § VII.E, does not change the analysis. An agency's standards govern its own officers; that provision does not restore the authority § 3-207(p)(3) and (q)(3) withdrew from counties, and § 18-124 reaches every federal, State, and local agency operating in the County. § 18-124(a)(1)–(2).

The United States may respond that § 18-124 was adopted in April, before the statute took effect, and that § 3-207(p)(3) and (q)(3) speak of adoption. The Maryland Constitution answers that point. A public general law "now or hereafter enacted" controls over a conflicting local law, Md. Const. art. XI-A, § 3, and a county may exercise its powers "only to the extent" they are not preempted, Local Gov't § 10-206(b). Enforcing § 18-124 after October 1 would be the exercise

of a power the General Assembly has withdrawn. Reading the statute to preserve county policies adopted before its effective date would also defeat the General Assembly's choice of one "uniform policy, to be used by each law enforcement agency." Pub. Safety § 3-207(p)(2)(i), (q)(2)(i).

The State Defendants read the statute the same way. State Defs.' Mem. at 5 & n.3 (describing § 3-207(p)(3) and (q)(3) as "a provision preempting any local laws related to face coverings and identification by law enforcement officers," and citing the bill sponsors' statements that the uniform policy "preempts the adoption of other policies regarding face coverings by counties"). So does the County. Ex. 3 ¶ 5. That reading is also consistent with the advice the County's Office of Law gave before enactment, that "[p]erhaps the County can align its efforts with policies adopted by the Commission." ECF No. 1-4 at 11; *see* Ex. 3 ¶ 3 (County Attorney's office advised the Council on the legality of CB-008-2026).

***b. Implied preemption***

If the Court were to read § 3-207(p)(3) and (q)(3) as forward-looking only, the result would be the same, because the General Assembly has occupied the field. The State law does not set a floor and leave the rest to the counties. It directs the MPTSC to write "a uniform policy, to be used by each law enforcement agency." Pub. Safety § 3-207(p)(2)(i), (q)(2)(i). It prescribes what that policy must say, down to "[t]he size, placement, contrast, and legibility of identification" and how identification is displayed on "jackets, vests, and rain gear." *Id.* § 3-207(q)(2)(iii). It defines "face covering" and lists nine items the term does not include. *Id.* § 3-535(a)(2). It sets the exceptions, the penalties, the form of the citation, the procedure in the District Court, and the State's Attorney's role. *Id.* §§ 3-535(b)–(e), 3-536(b)–(e). And it forbids any local policy other than the uniform one. *Id.* § 3-207(p)(3), (q)(3). That is the comprehensiveness *Howard County* and *Altadis* treat as the primary sign of an intent to occupy

the field. A County law on the same two subjects, with its own definitions, exceptions, and penalty, cannot coexist with a statewide scheme designed to be uniform.

***c. Conflict preemption***

Section 18-124 would be displaced even without the express bar, because it "prohibits an activity which is intended to be permitted by state law." *Skipper*, 329 Md. at 487 n.4. The General Assembly made the uniform policy the measure of what an officer may wear, Pub. Safety § 3-535(c), and forbade any other, *id.* § 3-207(p)(3), (q)(3), so what the State law exempts it intends to permit. The State law does not require identification of an officer "working in a plainclothes, nonuniformed, or undercover capacity," *id.* § 3-536(b), while § 18-124 requires every officer outside its warrant and tactical exceptions to display a name and identification number, § 18-124(b)(2). And the County law makes a misdemeanor what the State law treats as a civil offense. *Compare* § 18-124(d), *with* Pub. Safety §§ 3-535(d)(1), 3-536(d)(1). A local law that conflicts with a public general law "is preempted and thus is invalid." *Engage Armament*, slip op. at 44 (quoting *Coal. for Open Doors v. Annapolis Lodge No. 622*, 333 Md. 359, 379 (1994)).

Neither alternative depends on the word "adopt." Nor does the outcome of Count I affect any of the three. Section 3-207(p)(3) and (q)(3) allocate authority between the State and its counties; they impose no duty on any federal officer. Whatever the Court decides about the application of §§ 3-535 and 3-536 to federal officers, the County's authority to maintain a policy of its own on these subjects ended on October 1. Since that day, § 18-124 has been displaced by State law.

Because the County challenges the facts on which jurisdiction rests, the Complaint's allegation that enforcement of § 18-124 is "certainly impending," Compl. ¶ 73, receives no presumption of truth. *See Kerns*, 585 F.3d at 192. The record refutes it. On the day the United

States sued, § 18-124 could not lawfully be enforced against anyone, so there was no "credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159. The Complaint itself acknowledges that the State law "takes effect today, October 1, 2026." Compl. ¶ 73. Because the United States had no stake in Count II when it filed suit, the Court lacks subject-matter jurisdiction, and Count II should be dismissed under Rule 12(b)(1).

**2.** In the alternative, Count II became moot once § 18-124 was displaced.

If the Court concludes that standing existed when this action was filed, Count II is nonetheless moot. Since October 1, 2026, § 18-124 has prescribed nothing that any law enforcement officer is bound to obey; the State's uniform policy is the only operative rule on face coverings and identification. Count II seeks only prospective relief, Compl. ¶ 87; *id.*, Prayer for Relief ¶¶ A–B, and the United States "needs no prospective relief from provisions no longer in effect," *Adams Outdoor*, 105 F.4th at 564.

No exception to mootness applies, and the County's commitments confirm that nothing remains to decide. The voluntary-cessation exception seeks to prevent "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Porter*, 852 F.3d at 364 (quoting *ACLU of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 54–55 (1st Cir. 2013)). In the legislative context, the Fourth Circuit has held that the Supreme Court's decision applying the exception to a repealed ordinance, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982), "is generally limited to the circumstance, and like circumstances, in which a defendant openly announces its intention to reenact 'precisely the same provision' held unconstitutional below," and that otherwise "statutory changes that discontinue a challenged practice are 'usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'" *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000) (quoting *Mesquite*, 455 U.S. at 289,

and *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994)); *see Am. Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 605–06 (4th Cir. 2001). *Lighthouse* shows how the rule applies to a change the defendant did not engineer. There, COVID-19 executive orders had ended "in response to changed circumstances concerning COVID-19 and not in response to litigation," and when the state of emergency ended, "the Governor's power to issue new executive orders involving COVID-19-related restrictions was extinguished." 20 F.4th at 163–64. The Fourth Circuit held that neither exception to mootness applied. *Id.* at 162–65.

The exception has no application here. The change in the law was not the County's act, let alone one taken in response to this suit. It was the General Assembly's, enacted in May 2026, months before the United States sued, and effective on a date the County did not choose. The County cannot reenact § 18-124; State law forbids it to "adopt a policy, other than the uniform policy developed by the Commission." Pub. Safety § 3-207(p)(3), (q)(3). Like the Governor in *Lighthouse*, the County has lost the power to reinstate the challenged measure. And the County has announced no intention to reenact anything. Its position is the opposite. Ex. 3 ¶ 8. Nor does it matter that § 18-124 still appears in the County Code. Maryland treats a local law displaced by superior law as invalid and not enforceable to the extent of the displacement; no separate act of repeal is required before a court may give effect to preemption. *See Engage Armament*, slip op. at 44 (a local law that conflicts with a public general law "is preempted and thus is invalid" (quoting *Coal. for Open Doors v. Annapolis Lodge No. 622*, 333 Md. 359, 379 (1994))); Md. Const. art. XI-A, § 3 (public general law "now or hereafter enacted" controls over conflicting local law); Local Gov't § 10-206(b) (county powers exist "only to the extent" not preempted by or in conflict with public general law). The "capable of repetition yet evading review" exception, which the United States bears the burden of establishing and which is "a narrow one, reserved for

'exceptional' circumstances," *Lighthouse*, 20 F.4th at 165 (quotation omitted), fails for the same reason. A county policy that State law forbids is not one to which the United States can reasonably expect to be subject again.

Nor does conduct between April 29 and October 1, 2026 keep a controversy alive. First, no federal officer was cited, arrested, charged, or prosecuted under § 18-124 during that period, and the United States does not allege otherwise. Ex. 4 ¶¶ 5–6. The State Defendants make the same observation: the United States "cannot point to a single instance of the State's Attorney for Prince George's County prosecuting a federal officer for a violation of this provision." State Defs.' Mem. at 14. Second, the County's Police Department told the Council before the County law was enacted that it "will not be able to enforce this on another police department or a federal agency," ECF No. 1-4 at 13, and it never did. *See* Ex. 4 ¶¶ 4–6. Third, the County Attorney, whose office shares authority to enforce § 18-124, Ex. 3 ¶ 2, has committed on the County's behalf that the County will initiate no citation, arrest, referral, or charge under § 18-124 against any federal law enforcement officer for any conduct, before or after October 1, and will not invoke any savings provision that could be read to preserve liability for conduct before October 1. Ex. 3 ¶¶ 6–7. Fourth, the State's Attorney for Prince George's County, who shares enforcement authority and would prosecute any charge, *see* Md. Code Ann., Crim. Proc. § 15-102, has made the same commitment. Ex. 6 ¶¶ 5–7.

The United States' memorandum rests its standing on "a credible threat of imminent enforcement" and on the assertion that "Defendants have refused to disavow the application of these laws." Pl.'s Mem. 17. The County disavows enforcement of § 18-124 against federal officers, and it has undertaken to give the Court and the United States notice before any change in that position. Ex. 3 ¶¶ 6, 8. A commitment of that kind by the officials with authority to act,

resting on a change in State law that the County did not make and cannot undo, leaves no "legally cognizable interest in the outcome." *Lighthouse*, 20 F.4th at 162 (quotation omitted).

The United States lacked standing when it sued; alternatively, Count II is moot. It should be dismissed for lack of subject-matter jurisdiction. *S. Walk*, 713 F.3d at 185; *Adams Outdoor*, 105 F.4th at 564.

### B. IF THE COURT DOES NOT DISMISS COUNT II, IT SHOULD DEFER DECISION UNTIL THE FOURTH CIRCUIT DECIDES *UNITED STATES V. VIRGINIA*.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). It is not unlimited. "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both," and the party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Id.* at 255. In *Landis*, the district court stayed holding companies' challenges to the Public Utility Holding Company Act while the Government's test case on the Act's validity proceeded in another district. The Supreme Court rejected "the suggestion that before proceedings in one suit may be stayed to abide the proceedings in another, the parties to the two causes must be shown to be the same and the issues identical," *id.* at 254, and recognized that "[e]specially in cases of extraordinary public moment, the individual may be required to submit to delay," *id.* at 256. But the stay there was to last until the Supreme Court decided any appeal in the test case. The Court held it "immoderate" to that extent and fixed "the uttermost limit" at "the date of the first decision in the suit selected as a test, laying to one side the question whether it should even go so far." *Id.* at 256–57.

If the Court does not dismiss Count II, the narrowest course is to defer any ruling on the merits. The United States' claim turns on a single question of law: whether a rule of conduct that applies to all law enforcement officers, federal officers included, is a "direct regulation" of the federal government. That question is before the Fourth Circuit in *United States v. Virginia*, No. 26-1874 (4th Cir.), Dkt. 22 (calendaring argument for Oct. 27, 2026), and the Fourth Circuit's answer will bind this Court. Because the district court in *Virginia* has already ruled, Pl.'s Mem. 2, the County asks the Court to wait for the appellate decision—beyond the point *Landis* fixed for the stay before it. The circumstances here justify that request. The United States is not a stranger to the test case; it is the plaintiff there, litigating the same rule of law it asks this Court to apply. Unlike the district court decision that marked the limit in *Landis*, the Fourth Circuit's decision will bind this Court, so deciding first risks a ruling that must be revisited within months. The appeal is set to be argued on October 27, 2026, so any delay is short. And there is no fair possibility of damage to the United States: the County law is not operative, the County will not enforce it, and the only law that applies to federal officers in the County is the State's, which is the subject of Count I of the Complaint. Nor will the record change; the December 10 hearing is on argument and exhibits, without testimony. Scheduling Order, ECF No. 10. The Fourth Circuit's September 3, 2026 order denying the Commonwealth's motion for a stay pending appeal, *see* Pl.'s Mem. 20 & n.14, does not decide the appeal. The stay standard has four factors, only one of which concerns the merits, *Nken v. Holder*, 556 U.S. 418, 434 (2009), and the United States itself describes the authorities it cites as "not dispositive," Pl.'s Mem. 20. The County asks, in the alternative, that the Court defer decision on Count II, and on the motion insofar as it concerns the County, until the Fourth Circuit rules, with a joint status report within fourteen days afterward.

### C. IF THE COURT REACHES THE MOTION FOR A PRELIMINARY INJUNCTION, IT SHOULD BE DENIED AS TO THE COUNTY.

A preliminary injunction is "an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The movant must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm absent preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each element "must be satisfied as articulated." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010) (per curiam). The United States treats the third and fourth factors as merged, Pl.'s Mem. 14 (citing *Nken*, 556 U.S. at 435), and the County does not dispute it. Failure on any one factor defeats the motion; the United States fails on each as to the County.

#### 1. No likelihood of success.

The United States cannot show a likelihood of success against the County because it cannot establish standing. At the preliminary-injunction stage, a plaintiff must make a "clear showing" that it is "likely" to establish every element of standing, and "[t]o obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury." *Murthy v. Missouri*, 603 U.S. 43, 58, 69 (2024). For the reasons in Part III.A, no such risk is traceable to the County: State law displaced § 18-124 on October 1, the County has not enforced the County law against a federal officer, and the County has disavowed any future enforcement. Without a live controversy over enforcement, there is nothing on which the United States can succeed. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Because § 18-124 has no force, the Court need not and should not decide whether it was valid while operative. Should the Court reach that question,

the County adopts and incorporates by reference the State Defendants' defense of the State law to the extent it applies to § 18-124, both in opposition to the motion and, in the alternative, as a ground for dismissing Count II under Rule 12(b)(6). State Defs.' Mem. at 20–29 (Part II.B.ii).

**2. No irreparable harm.**

To establish irreparable harm, "the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quotation omitted). Because an injunction looks forward, the movant must show "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). In the pre-enforcement setting, that danger turns on whether the officials who enforce the law have disavowed doing so. *See Babbitt*, 442 U.S. at 302; *Driehaus*, 573 U.S. at 164–65. The County-specific record defeats any such showing. The County law was operative for five months, yet no federal officer was cited, arrested, charged, or prosecuted under it; no federal declarant identifies an operation in Prince George's County that was cancelled, delayed, or altered because of it; and the County Police Department advised before enactment that it could not enforce the County law against a federal agency. ECF No. 1-4 at 13; Ex. 4 ¶¶ 4–6. Since October 1, State law has displaced the County law, and the County has committed that it will neither enforce § 18-124 against a federal officer nor invoke any savings provision for earlier conduct. Ex. 3 ¶¶ 6–7. The United States' own theories of harm—that harm "necessarily results from the enforcement" of a law that violates the Supremacy Clause, Pl.'s Mem. 24, and that officers "face a catch-22" between compliance and penalties, *id.* at 16—presuppose a law that can be enforced. An officer who wears a face covering in Prince George's County today violates no

County law. Whatever arguments the United States may direct to the State law, it faces no actual and imminent threat from this County. *See Winter*, 555 U.S. at 22 (harm must be likely).

The declarations do not alter that conclusion. The one Maryland incident the ICE declarant describes in detail occurred in Hyattsville, in this County, but it involved a man filming officers who remained in their vehicles; the declaration does not say the officers were unmasked, spoke to him, or were identified because of § 18-124, and no County officer is alleged to be involved. Baker Decl. ¶ 39. Her accounts of doxxing involving Maryland-based officers do not say how the officers were identified. *Id.* ¶¶ 36–38. The DEA's example involves an operation in Minneapolis, Allen Decl. ¶ 20, and the CBP declarant describes no incident in Maryland, *see* Hargis Decl. Congress itself requires federal law enforcement personnel who support the response to a civil disturbance to "visibly display" an individual identifier and their agency's name, 10 U.S.C. § 723(a), (c), and CBP permits face coverings only "in limited and specific circumstances," Hargis Decl. ¶ 14. The FBI declaration says only that enforcement "could reasonably be expected" to endanger agents, Paul Decl. ¶¶ 12, 15, 18—language borrowed from FOIA Exemption 7, 5 U.S.C. § 552(b)(7)(E)–(F), which "sets a relatively low bar," *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011), not the likelihood *Winter* requires. Its only operational example concerns covert surveillance, which falls within the uniform policy's covert-investigation exceptions, and the declarant voted for the motion adopting that policy. Paul Decl. ¶ 16; Ex. 1 §§ III.B, IV.C, V.B; Ex. 2; Recording at 50:08–50:11. It identifies no likely harm from enforcement by Prince George's County.

The timing of this suit also undercuts any claim of urgency. Section 18-124 was operative from April 29 to October 1, 2026, and the United States did not challenge it until the day State law displaced it. A movant "must generally show reasonable diligence," *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam), and delay "may still indicate an absence of the kind of irreparable

harm required to support a preliminary injunction," *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (quotation omitted). The County does not suggest the United States had to sue sooner. The point is that the County law and federal operations coexisted for five months without a single enforcement action, Ex. 4 ¶¶ 5–6, and the FBI's senior special agent in Maryland claimed no emergency when he voted for the State's policy on September 2, 2026. The transcript records no statement by him at that session other than his roll-call response and his vote. Ex. 5 at 3:15–17, 43:22–24.

**3. The equities and the public interest favor denial.**

The equities and public interest likewise favor denial as to the County. The United States relies on the rule that a state is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." Pl.'s Mem. 28 (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). That rule assumes a likelihood of success the United States cannot show and a law that someone is enforcing. An injunction would prevent no threatened County action: § 18-124 has been displaced, and the County has sworn that it will not enforce it. Ex. 3 ¶¶ 6–7. The public interest the Council pursued in enacting § 18-124 is now secured by the State's uniform policy, which the County supports. Deciding the constitutionality of a displaced County law on a preliminary record—while the Fourth Circuit considers an informative Supremacy Clause issue in *United States v. Virginia*—would be effectively advisory and would provide the United States no practical relief against this County.

If the Court nevertheless grants relief against the County, it should be limited to § 18-124 as applied to federal officers acting within the scope of their federal duties. It should not reach the State's uniform policy, the County's authority over its own police, or State and local officers who

perform immigration functions under agreements authorized by 8 U.S.C. § 1357(g), who are not treated as federal employees except for specified purposes, *see id.* § 1357(g)(7)–(8). Count I pleads only "Maryland's enforcement" of the State law, Compl. ¶ 81, and the Complaint alleges no enforcement or threatened enforcement of the State law by the County; relief on Count I, if any, should run against the State Defendants. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

## IV. CONCLUSION

State law displaced § 18-124 on October 1, 2026, before the United States could establish standing to challenge prospective County enforcement. Count II should be dismissed without prejudice for lack of subject-matter jurisdiction, and the motion for a preliminary injunction should be denied as to the County. If the Court does not dismiss Count II, it should defer decision until the Fourth Circuit decides *United States v. Virginia*. In the further alternative, any relief should be limited as set out in Part III.C.

Respectfully submitted,

s/Erek L. Barron
Erek L. Barron (Federal Bar No. 15693)
EBarron@mintz.com
Michelle N. Lipkowitz (Federal Bar No. 27188)
MNLipkowitz@mintz.com
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
555 12th Street NW, Suite 1100
Washington, D.C. 20004
Tel: 202-434-7300

*Counsel for Defendant Prince George's County, Maryland*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 26, 2026, the foregoing was filed through the Court's CM/ECF system, which will send notice of filing to all counsel of record.

/s/Erek L. Barron
Erek L. Barron