**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF MARYLAND, ANTHONY G. BROWN, in his official capacity as Attorney General of Maryland, MARYLAND POLICE TRAINING AND STANDARDS COMMISSION, PRINCE GEORGE'S COUNTY, MARYLAND, and MONTGOMERY COUNTY, MARYLAND,<br><br>Defendants. | Civ. No. 26-cv-04110-JRR |

**MEMORANDUM OF LAW IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND .......... 2

I. Factual Background .......... 2

A. Maryland Enacts Senate Bill 1 .......... 2

B. The Commission Adopts a Uniform Policy .......... 6

II. Procedural History .......... 8

STANDARD OF REVIEW .......... 8

ARGUMENT .......... 10

I. The United States Lacks Standing to Sue the Named Defendants .......... 10

A. The Named State Defendants Are Not Proper Parties to This Suit .......... 10

B. The United States Has Not Suffered an Injury-In-Fact .......... 13

II. The United States Has Not Established the Elements for a Preliminary Injunction .......... 17

A. The United States Has Not Shown That It Is Likely to Suffer Irreparable Harm .......... 17

B. The United States Is Unlikely to Succeed on the Merits .......... 20

i. The United States Has Failed to Establish Standing .......... 20

ii. Even If This Court Had Jurisdiction, the United States' Facial Challenge to SB1 Is Unlikely to Succeed .......... 20

C. The Public Interest and Balance of the Equities Weigh Against Issuing a Preliminary Injunction .......... 29

CONCLUSION .......... 30

# TABLE OF AUTHORITIES

## Cases

*Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554 (4th Cir. 2024)............11, 13

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987). ........................................................ 38

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). ................................................ 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................11

*Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379 (D. Md. 2022).......................... 22, 23

*California v. Texas*, 593 U.S. 659 (2021)................................................................................ 20, 21

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). ................................................................. 17

*Davis v. State*, 426 Md. 211 (2012)................................................................................................ 6

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) ................................................................. 21

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802 (4th Cir. 1991)..............................11

*Disability Rts. S.C. v. McMaster*, 24 F.4th 893 (4th Cir. 2022).................................................. 13

*Flast v. Cohen*, 392 U.S. 83 (1968)............................................................................................... 21

*Fusaro v. Howard*, 19 F.4th 357 (4th Cir. 2021) .................................................................... 31, 33

*Fusaro v. Howard*, 472 F. Supp. 3d 234 (D. Md. 2020) ............................................................. 34

*Genesis GSA Strategic One, LLC v. Howard County*, No. 26-CV-915, 2026 WL 2294479 (D. Md. Aug. 10, 2026) ............................................................................................................................ 33

*Grant v. Higgins*, 146 S. Ct. 2811 (2026). .................................................................................... 22

*Guzman v. Acuarius Night Club LLC*, 167 F.4th 217 (4th 2026)..................................................11

*Hancock v. Train*, 426 U.S. 167 (1976) .................................................................... 27, 29, 32, 37

*Henderson v. Bluefield Hosp. Co.*, 902 F.3d 432 (4th Cir. 2018) ............................................... 12

*Holmes v. Elephant Ins. Co.*, 156 F.4th 413 (4th Cir. 2025) ....................................................... 17

*Hunter Grp., Inc. v. Smith*, 164 F.3d 624 (4th Cir. 1998). .......................................................... 24

*In re Crim. Investigation No. CID 18-2673 in Cir. Ct. for Baltimore City*, 493 Md. 646 (2026) 14, 15

*Johnson v. Maryland*, 254 U.S. 51 (1920) ........................................................ 28, 29, 31, 32

*LaFave v. Cnty. of Fairfax, Virginia*, 149 F.4th 476 (4th Cir. 2025)........................................... 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)........................................................................ 13

*Maryland Shall Issue, Inc. v.* Hogan, 971 F.3d 199 (4th Cir. 2020) ........................................... 18

*Maryland v. King*, 133 S. Ct. 1 (2012)............................................................................................. 38

*Maryland v. Mullin*, 831 F. Supp. 3d 325 (D. Md. 2026). ........................................................... 26

*Maryland v. United States*, 360 F. Supp. 3d 288 (D. Md. 2019)........................................... 21, 34

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ................................................................................ 16

*McCulloch v. Maryland*, 17 U.S. 316 (1819)...................................................................................... 27

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)...................................................... 22

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019)). ................ 22

*Murthy v. Missouri*, 603 U.S. 43 (2024) .................................................................................... 12, 17

*Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213 (2d Cir. 2025)................................................ 22

*Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215 (3d Cir. 2023)............. 19

*National Bank v. Commonwealth*, 76 U.S. 353 (1869)..................................................................... 27

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350 (1989) ........ 23

*Nken v. Holder*, 556 U.S. 418 (2009)................................................................................................ 37

*Norfolk Southern Ry Co. v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010)............................. 34

*North Dakota v. United States*, 495 U.S. 423 (1990)...................................................... 26, 27, 36

*Penn Dairies, Inc. v. Milk Control Comm'n of Pa*., 318 U.S. 261 (1943) .................................... 27

*Robinson v. Nat'l Collegiate Athletic Ass'n*, 172 F.4th 271 (4th Cir. 2026) ................................ 12

*Rouse v. Fader*, 171 F.4th 272 (4th Cir. 2026).................................................................................. 13

*Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268 (4th Cir. 2025)...............................................11

*State ex rel. Atty. Gen. v. Burning Tree Club, Inc.*, 301 Md. 9 (1984). ......................................... 30

*State v. Brown*, 200 Md. App. 47 (2011) ............................................................................................ 14

*State v. Romulus*, 315 Md. 526 (1989) ........ 14

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). ........ 17, 18

*Tankersley v. Almand*, 837 F.3d 390 (4th Cir. 2016) ........ 16

*United States v. California*, 173 F.4th 1060 (9th Cir. 2026), ........ 35

*United States v. California*, 824 F. Supp. 3d 1079 (C.D. Cal. 2026) ........ 19, 20

*United States v. California*, No. 26-926, 2026 WL 3071018 (9th Cir. Oct. 14, 2026). .... 35, 36, 37

*United States v. Chappell*, 691 F.3d 388 (4th Cir. 2012); ........ 34, 36

*United States v. City of Bos.*, 833 F. Supp. 3d 30 (D. Mass. 2026) ........ 20, 21

*United States v. Commonwealth of Virginia*, 139 F.3d 984 (4th Cir. 1998) ........ 32, 33

*United States v. Commonwealth of Virginia*, No. 26-2248 (4th Cir. 2026) ........ 35

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016). ........ 31

*United States v. Russell*, 797 F. Supp. 3d 552 (D. Md. 2025), ........ 16

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) ........ 23

*United States v. Walz*, 825 F. Supp. 3d 897 (D. Minn. 2026) ........ 15

*United States v. Washington*, 596 U.S. 832 (2022) ........ 26, 27, 29, 36

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) ........ 20

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)) ........ 31

*Whole Woman's Health v. Jackson*, 141 S. Ct. 2494 (2021) ........ 16

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........ 12, 21, 38

**Constitutional Provisions**

Md. Const. art. V, § 7, ........ 14

**Statutes and Regulations**

2026 Md. Laws Ch. 612, S.B. No. 1 ........ passim

Md. Code Ann., Pub. Safety § 3–207 ........ passim

Md. Code Ann., Pub. Safety § 3-535 ........ 3

Md. Code Ann., Pub. Safety § 3–536 .......... passim

Md. Code Ann., Pub. Safety § 3–537 .......... passim

862 Md. Laws 197, Ch. 177 .......... 15

COMAR 12.04.09 .......... 9, 15

COMAR 12.04.09.01. .......... 10

COMAR 12.04.09.02 .......... 10

Md. Code Ann., Crim. Proc. § 15–102 .......... 19

Md. Code Ann., Crim. Proc. § 15–102 (2025). .......... 14

Prince George's County Code § 18-124(d) .......... 18

Public Safety Article, § 3-201 .......... 10

**Other Authorities**

Hearing on SB1 Before the Judicial Proceedings Committee, 2026 Leg., Reg. Session (Jan. 22, 2026) .......... 3

Hearing on SB1 Before the Judicial Proceedings Committee, 2026 Leg., Reg. Session (Jan. 27, 2026) .......... 6

Hearing on SB1 Before the Judiciary Committee, 2026 Leg., Reg. Session (March 31, 2026) .......... 6

Letter from Anthony G. Brown, Att'y Gen., to Wes Moore, Gov. of Md. (May 12, 2026) .......... 29, 30

Md. Police Corr. Training Comm'n, Police Training and Standards Commission Meeting (Sept. 2, 2026) .......... 7

Md. Police Corr. Training Comm'n, Police Training and Standards Commission Uniform Policy: Face Coverings and Identification (eff. Oct. 1, 2026; rev. Oct. 7, 2026) .......... 7, 8, 9, 30

## INTRODUCTION

In May 2026, the Governor of Maryland signed into law Senate Bill 1, a public safety law that imposes new requirements on law enforcement officers operating within the State of Maryland. Broadly, SB1 prohibits law enforcement officers from wearing face coverings and requires officers to identify themselves when performing their official duties within the State, subject to reasonable exceptions. SB1 took effect on October 1, 2026.

On the same date as SB1's effective date, the United States brought this action, claiming in Count I that SB1 violates the intergovernmental immunity doctrine of the Supremacy Clause because it impermissibly regulates the federal government. The United States named as Defendants the State of Maryland, Attorney General Anthony G. Brown, and the Maryland Police Training and Standards Commission (collectively, the "State Defendants"). The United States simultaneously sought the extraordinary relief of a preliminary injunction.[1]

A host of threshold defects independently require dismissal of the United States' claims against the State Defendants. First, the United States has not established Article III standing because none of the named State Defendants have any enforcement authority under SB1, and therefore the United States has failed to satisfy the causation and redressability prongs of standing. Further, the United States has not established an injury in fact, as the threat of prosecution against federal officers is neither actual nor imminent, and the United States' alleged sovereign injury is insufficient to establish injury by itself. Accordingly, the United States' claims against the State Defendants should be dismissed.

[1] The United States also brought Counts II and III challenging the county ordinances of Prince George's County, Maryland, and Montgomery County, Maryland, respectively, as violating the intergovernmental immunity doctrine. Those separate counts are addressed in separate briefing by the County Defendants, as acknowledged by the Court's Order. ECF No. 10.

For similar reasons, the United States has failed to show it is entitled to a preliminary injunction against the State Defendants. Given that the United States cannot demonstrate standing, it likewise cannot show irreparable harm or a likelihood of success on the merits. Further, even if this Court had jurisdiction, the United States cannot show a likelihood of success on the merits because it cannot meet the high threshold for a facial challenge to SB1, and the canon of constitutional avoidance weighs against deciding a broad challenge in the absence of any application. Finally, the public interest and balance of the equities do not support issuance of the extraordinary relief of an injunction. All of the preliminary injunction factors therefore weigh against granting the United States' motion for a preliminary injunction.

The Maryland legislature made lawful policy choices to regulate law enforcement officers in the manner it determined would promote public safety, protect individual rights, and foster community trust. The Court should reject the United States' effort to displace a duly-enacted state law in the absence of any harm to the United States from the mere passage of this law. Plaintiffs' claims should be dismissed and their motion for preliminary injunction should likewise be denied.

## BACKGROUND

## I. Factual Background

### A. Maryland Enacts Senate Bill 1

In May 2026, Governor Wes Moore signed into law Maryland Senate Bill 1, titled "AN ACT concerning Public Safety – Law Enforcement Officers – Face Coverings and Identification." 2026 Md. Laws Ch. 612, S.B. No. 1 (codified at Md. Code Ann., Pub. Safety §§ 3–207, 3–536, 3–537 (2026)) (hereinafter, "SB1").[2] SB1 was passed to codify "the best practice of law enforcement

[2] While SB1 was originally codified at Md. Code Ann., Pub. Safety §§ 3-207, 3-535, 3-536, the code sections were later adjusted to §§ 3-207, 3-536, and 3-537.

transparency, building trust with the community that they serve." Hearing on SB1 Before the Judicial Proceedings Committee, 2026 Leg., Reg. Session at 2:23:40–2:23:50 (Jan. 22, 2026) (statement of Sen. Augustine, bill sponsor), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jpr&ys=2026RS&clip=JPR_1_22_2026_meeting_1&billNumber=sb0001. SB1 contains two main components.

First, SB1 generally prohibits law enforcement from covering their faces while performing their official duties within the State of Maryland, subject to reasonable exceptions. Under SB1, "law enforcement officer[s] may not wear a face covering while in the performance of duty in the state, except as authorized in the uniform policy adopted by the Maryland Police Training and Standards Commission under § 3–207 of this title." Md. Code Ann., Pub. Safety § 3–536(c). SB1 defines a "face covering" to mean "any opaque mask, garment, helmet, headgear, or other item that conceals or obscures the face of an individual," and specifically exempts, among other things, "protective gear worn during tactical operations for purposes of physical safety." *Id.* § 3–536(a)(2). SB1's facial covering provision expressly "does not apply to a law enforcement officer actively engaged in an undercover operation." *Id.* § 3–536(b).

Second, SB1 requires that law enforcement officers identify themselves to the public during their official duties. Specifically, SB1 requires that "law enforcement officer shall wear identification on the law enforcement officer's outermost layer of clothing while in the performance of duty in the state." *Id.* § 3–537(c)(1). Further, "[o]n request of another, a law enforcement officer shall verbally disclose identification while in the performance of duty in the state." *Id.* § 3–537(c)(2). SB1's identification provision expressly "does not apply to a law enforcement officer working in a plainclothes, nonuniformed, or undercover capacity." *Id.* § 3–537(b).

Upon its enactment, SB1 directs the Maryland Police Training and Standards Commission to "develop a uniform policy, to be used by each law enforcement agency, prohibiting the use of a face covering by a law enforcement officer in the course of duty" and "requiring the use of identification by a law enforcement officer in the course of duty." *Id.* § 3–207(p)(2), (q)(2). Relevant to this uniform policy, SB1 provides that the "the uniform policy may allow for uses of face coverings under circumstances absolutely necessary to protect the health or safety of law enforcement officers while performing public safety functions." *Id.* § 3–207(p)(2)(iii). The uniform policy must also address "the size, placement, contrast, and legibility of identification," "the way identification must be displayed," "narrowly tailored circumstances in which identification may be temporarily obscured due to an immediate threat," and "training requirements for new and current law enforcement officers." *Id.* § 3–207(q)(2)(iii)(1)-(4).

The new policies enacted under SB1 apply to "law enforcement agenc[ies]," which is defined to include an agency of the state of Maryland, another state, a political subdivision of the state of Maryland or another state, or the federal government. *Id.* § 3–536(a)(3); *see also id.* at § 537(a)(3) (cross-referencing the meaning stated in § 3–536); *id.* at § 3–207(p)(1)(iii) (same); *id.* at § 3–207(q)(1)(iii) (same). SB1 establishes that a law enforcement officer who violates the face covering or identification restrictions is guilty of a civil offense and subject to a fine not exceeding $1,500. *Id.* § 3–536(d)(1); *id.* § 3–537(d)(1). A violation of either restriction also constitutes police misconduct for purposes of Subtitle 1 of the Maryland Code, Public Safety Section. *Id.* § 3–536(d)(2); *id.* § 3–537(d)(2).

SB1 provides that a "police officer may issue a citation to a law enforcement officer who the police officer has probable cause to believe is committing or has committed a violation." *Id.* § 3–536(e)(1); *id.* § 3–537(e)(1). Subsequently, the "law enforcement agency of the police officer

who issued the citation shall forward to the district court having venue a copy of the citation and a request for trial," upon which "[t]he district court shall promptly schedule the case for trial and summon the defendant to appear." *Id.* § 3–536(e)(5)(i)-(ii); *id.* § 3–537(e)(5)(i)-(ii). SB1 further provides that "the State's Attorney for a county may prosecute a civil offense under this section in the same manner as prosecution of a violation of the criminal laws of the state." *Id.* § 3–536(e)(10); *id.* § 3–537(e)(10). In such a civil offense case, the State's Attorney is authorized to "exercise authority in the same manner as prescribed by law for violation of the criminal laws of the state." *Id.* § 3–536(e)(11)(ii); *id.* § 3–537(e)(11)(ii).

Finally, SB1 contains a provision preempting any local laws related to face coverings and identification by law enforcement officers. *See id.* § 3–207(p)(3) ("A county, a municipality, or a law enforcement agency of the state or a political subdivision of the state may not adopt a policy, other than the uniform policy developed by the commission, regarding the use of face coverings by law enforcement officers."); *id.* § 3–207(q)(3) (same for "requiring the use of identification by law enforcement officers."). The legislative history supports reading these provisions as preempting local policies,[3] which is indicative of legislative intent. *See*, e.g., *Davis v. State*, 426 Md. 211, 231 n.7 (2012) ("We rely on the testimony of the bill sponsor in determining the

[3] *See* Hearing on SB1 Before the Judicial Proceedings Committee, 2026 Leg., Reg. Session at 40:50–41:20 (Jan. 27, 2026) (statement of Sen. Smith, bill sponsor) (referring to "preemption language that all twenty-four jurisdictions would have to adhere to what [the Commission] does"), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jpr&clip=JPR_1_27_2026_meeting_2&ys=2026rs; Hearing on SB1 Before the Judiciary Committee, 2026 Leg., Reg. Session at 1:19:40–1:19:55 (March 31, 2026) (statement of Sen. Augustine, bill sponsor) (referring to "adoption of a uniform policy" that "preempts the adoption of other policies regarding face coverings by counties"), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jud&ys=2026RS&clip=JUD_3_31_2026_meeting_1&billNumber=sb0001.

legislative intent; especially where there were minimal amendments to the bill introduced after that testimony.").

**B. The Commission Adopts a Uniform Policy**

On September 2, 2026, the Maryland Police Training and Standards Commission issued its uniform policy pursuant to SB1. *See* Md. Police Corr. Training Comm'n, Police Training and Standards Commission Uniform Policy: Face Coverings and Identification (eff. Oct. 1, 2026; rev. Oct. 7, 2026) ("Uniform Policy"), https://perma.cc/553B-L9D6. The Commission voted to adopt the Uniform Policy by a vote of 9 Yays to 2 Nays. *See* Md. Police Corr. Training Comm'n, Police Training and Standards Commission Meeting at 48:54–50:34 (Sept. 2, 2026), https://www.youtube.com/watch?v=CoK-5dNP8Zc.[4]

Regarding the prohibition on face coverings, the Uniform Policy broadly reiterates the statutory requirements of SB1, though it adds an exception to the requirement for law enforcement officers engaged in covert operations. *Compare* Uniform Policy at 3 ("This section does not apply to a law enforcement officer working in an undercover capacity *or on a covert investigation*." (emphasis added)), with Md. Code Ann., Pub. Safety § 3–536(b) ("This section does not apply to a law enforcement officer actively engaged in an undercover operation."). The Uniform Policy defines a "covert investigation" as "a discreet investigative method where law enforcement gathers evidence or intelligence of suspected criminal activity without the immediate knowledge of the

[4] According to the voting record, Jimmy Paul, the Special Agent in Charge of the Baltimore Field Office, Federal Bureau of Investigation, voted in favor of the Uniform Policy. *See* Police Training and Standards Commission Meeting at 50:03. Notwithstanding the fact that Mr. Paul voted in favor of the policy, the United States now relies on a declaration from Jimmy Paul claiming that enforcement of SB1 could cause significant harm to the FBI's ability to carry out its mission. *See* Decl. Jimmy Paul, ECF No. 2–3.

subject, utilizing tactics such as undercover infiltration, physical or electronic surveillance, and confidential informants." Uniform Policy at 2.

Regarding the identification requirement, the Uniform Policy also reiterates the statutory requirement, though it adds further detail. For instance, the Uniform Policy likewise provides additional exemptions from the identification requirement for law enforcement officers engaged in covert investigations or while off duty. *Compare* Uniform Policy at 4 ("This section does not apply to a law enforcement officer working in an undercover capacity, in plain clothes, in a non-uniformed status, *on a covert investigation, or while off duty*." (emphasis added)), *with* Md. Code Ann., Pub. Safety § 3–537(b) ("This section does not apply to a law enforcement officer working in a plainclothes, nonuniformed, or undercover capacity."). Further, the Uniform Policy establishes that the mandatory minimum identifiers for display are (1) the last name of the law enforcement officer, (2) a unique employee identification number, and (3) the name of the law enforcement agency. Uniform Policy at 4.

Further, the Uniform Policy establishes additional exceptions and mandatory reporting requirements. For instance, "[i]f an active field emergency or an imminent, demonstrable threat to the health or safety of an officer requires identification to be temporarily obscured or removed, a deviation from policy is permitted strictly for the duration of the imminent threat." Uniform Policy at 4. In such an instance where an officer "obscures or removes their identification" for this reason, then the "officer or agency must document the specific type, context, and duration of the threat." *Id.*

Finally, related to compliance and enforcement, the Uniform Policy makes clear that a "violation of this policy constitutes police misconduct for purposes of disciplinary action, pursuant to COMAR 12.04.09." Under Maryland regulations, COMAR 12.04.09 establishes protocols for

police accountability. It "establishes a civilian process to receive and process allegations of police officer misconduct" and "make disciplinary recommendations involving misconduct," and it directs the "agency head of each law enforcement agency" to "develop the agency's own procedures to process complaints of misconduct." COMAR 12.04.09.01. For purposes of this section, a "'Law enforcement agency' has the meaning stated in Public Safety Article, § 3–201, Annotated Code of Maryland," COMAR 12.04.09.02, which in turn defines a "law enforcement agency" to mean "a governmental police force, sheriff's office, or security force or law enforcement organization of the State, a county, or a municipal corporation that by statute, ordinance, or common law is authorized to enforce the general criminal laws of the State," Md. Public Safety § 3–201(d)(1).

## II. Procedural History

On October 1, 2026, the United States brought this action against the State of Maryland, Attorney General Anthony G. Brown, the Maryland Police Training and Standards Commission, Prince George's County, Maryland, and Montgomery County, Maryland. The United States alleges that SB1 violates the Supremacy Clause (Count I), while also bringing parallel claims against the county codes of Prince George's County and Montgomery County (Counts II and III, respectively). The United States brought a preliminary injunction motion seeking to enjoin Defendants from implementing and enforcing the challenged laws as to federal law enforcement officers.

## STANDARD OF REVIEW

State Defendants move to dismiss Plaintiffs' claims for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction where the plaintiff

lacks Article III standing. *Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554, 564 (4th Cir. 2024). A motion to dismiss under Rule 12(b)(6) "presents a pure question of law, which simply inquires whether the complaint alleges sufficient factual matter, accepted as true, to provide a sufficient basis 'to state a claim to relief that is plausible on its face.'" *Guzman v. Acuarius Night Club LLC*, 167 F.4th 217, 221 (4th 2026) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing a motion under Rule 12(b)(6), a court need not accept legal conclusions set forth in the complaint. *Iqbal*, 556 U.S. at 678.

Additionally, State Defendants oppose Plaintiffs' motion for preliminary injunction. "[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 273 (4th Cir. 2025) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp*., 952 F.2d 802, 816 (4th Cir. 1991)). When seeking a preliminary injunction, a "plaintiff must make a 'clear showing' that []he is 'likely' to establish each element of standing.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008)). Plaintiffs must also show (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm if preliminary relief is not granted, (3) the balance of the equities favors them, and (4) an injunction is in the public interest. *Robinson v. Nat'l Collegiate Athletic Ass'n*, 172 F.4th 271, 286 (4th Cir. 2026) (citing *Winter*, 555 U.S. at 20). A court should deny plaintiffs' motion if any one factor is not clearly established. *See Henderson v. Bluefield Hosp. Co*., 902 F.3d 432, 439 (4th Cir. 2018) ("*Winter* made clear that each of these four factors must be satisfied to obtain preliminary injunctive relief.").

## ARGUMENT

### I. <u>The United States Lacks Standing to Sue the Named Defendants</u>

#### A. The Named State Defendants Are Not Proper Parties to This Suit

In bringing Count I to challenge SB1, the United States named the State of Maryland, Attorney General Anthony G. Brown, and the Maryland Police Training and Standards Commission (collectively, the "State Defendants"). The claim against these State Defendants must be dismissed because the injury to the United States is not traceable to these State Defendants.

"Article III requires the proper parties, seeking proper relief." *Rouse v. Fader*, 171 F.4th 272, 275 (4th Cir. 2026). "To establish standing, a plaintiff must plead facts that allege (1) that he has suffered or imminently will suffer an injury-in-fact which is (2) causally connected to the challenged provisions and (3) capable of being redressed by a favorable outcome in court." *Adams Outdoor Advert.*, 105 F.4th at 564–65 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The causation and redressability prongs of standing "demand[] that a plaintiff's alleged injury be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Rouse*, 171 F.4th at 280 (quoting *Lujan*, 504 U.S. at 560); *see also Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 903 (4th Cir. 2022) ("[R]edressability is 'problematic when third persons not party to the litigation must act in order for an injury to arise or be cured.'" (citation omitted)). Further, "[s]atisfying this traceability requirement is especially difficult when a plaintiff's injury results most immediately from the conduct of a third party not before the court," and "[i]n such cases, the plaintiff must allege some causal connection between the defendant's actions and the third party's intervening conduct." *Id.*

Here, the United States' pre-enforcement challenge under Count I must be dismissed because the claimed harm—threatened prosecution for violations of SB1—is not traceable to the named State Defendants, but instead resides with a third party not before this Court, that is, the State's Attorneys. The law expressly provides that the "State's Attorney for a county may prosecute a civil offense" for a violation of the face covering or identification requirements "in the same manner as prosecution of a violation of the criminal laws of the State." Md. Code Ann., Pub. Safety § 3–536(e)(10); *id.* § 3–537(e)(10). The "State's Attorney" is established by the Maryland Constitution as an elected position in each county and the City of Baltimore, Md. Const. art. V, § 7, and the General Assembly authorized each State's Attorney to, "in the county served by the State's Attorney, prosecute and defend on the part of the State all cases in which the State may be interested," Md. Code Ann., Crim. Proc. § 15–102. Moreover, "Maryland courts have noted that the State's Attorney is 'vested with the broadest official discretion' to institute and prosecute criminal cases." *State v. Brown*, 200 Md. App. 47, 52 (2011) (quoting *State v. Romulus*, 315 Md. 526, 537 (1989)).

The United States never argues that any of the named State Defendants have enforcement authority under SB1, nor could it. First, the Attorney General of Maryland possesses no common-law power to prosecute, unless the Constitution or a statute confers it. *See In re Crim. Investigation No. CID 18-2673 in Cir. Ct. for Baltimore City*, 493 Md. 646, 661 (2026) ("OAG's powers are limited to those vested in the Attorney General by the Maryland Constitution and the enactments of the General Assembly."). Instead, Maryland law establishes that the "State's Attorneys represent the State in prosecutions and defenses in which the State is interested." *Id.* (citing 862 Md. Laws 197, Ch. 177). Because SB1 confers no enforcement authority on the Attorney General, it follows that the Attorney General lacks authority to enforce the law.

Moreover, the Commission has no enforcement authority over federal officers. Though SB1 tasked the Commission with adopting a uniform policy concerning face coverings and identification, it delegated no enforcement authority to the Commission over a violation of the policy. Nor does the Commission have authority to investigate federal police misconduct for disciplinary action pursuant to the Uniform Policy, which stated that disciplinary action is to be handled pursuant to state regulations that govern police misconduct of state and local officials only. *See* COMAR 12.04.09; *see supra*, page 7.

Because neither of these State Defendants can enforce SB1 against the federal government, any injury to the federal government necessarily results from the independent actions of third parties not before this Court—namely, the State's Attorneys tasked with prosecuting violations of SB1. An order enjoining enforcement of SB1 against the Attorney General and Commission would therefore not redress the claimed injuries. *See United States v. Walz*, 825 F. Supp. 3d 897, 906 (D. Minn. 2026) ("Because the United States has not sufficiently alleged that Governor Walz or Attorney General Ellison have enforcement authority over the Minnesota statutes, it has not established the required traceability or redressability to establish Article III standing."). The claims against these State Defendants must be dismissed.

Nor can the United States argue that the State of Maryland, as a whole, is tasked with enforcing the law. The State of Maryland "can act only through its officers and agents." *Tankersley v. Almand*, 837 F.3d 390, 398 (4th Cir. 2016) (quoting *Nevada v. Hicks*, 533 U.S. 353, 365 (2001)). A state-wide injunction would therefore encompass countless State employees with no connection whatsoever to enforcement of SB1. So too, an injunction would run to the judges tasked with hearing the case at trial and potentially imposing fines, Md. Code, Pub. Safety § 3–536(e); *id.* § 3–537(e), potentially running afoul of the doctrine that [j]udicial immunity protects

judges from suit." *United States v. Russell*, 797 F. Supp. 3d 552, 572 (D. Md. 2025), *on appeal*, 25-2004 (4th Cir.). Further, an injunction against the State without any connection to a specific official with enforcement authority would be no different from enjoining the law itself, which is contrary to the limits on federal courts' equitable powers. *See Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) ("[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves."); *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) (emphasizing that in "a case for preventive relief," the court "enjoins, in effect, not the execution of the statute, but the acts of the official, the statute notwithstanding"). The State of Maryland is therefore not a proper defendant.

Because the United States has not demonstrated any connection between the named State Defendants and enforcement of SB1, Count I of the Complaint must be dismissed.

**B. The United States Has Not Suffered an Injury-In-Fact**

The United States has also not suffered an injury-in-fact. "An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). An "actual or imminent" injury is "certainly impending," not "speculative." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). That is, "'plaintiffs must show a substantial risk that' [the alleged injury] will happen 'in the near future.'" *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 429 (4th Cir. 2025) (quoting *Murthy*, 603 U.S. at 58). Here, the United States claims two forms of injury—threat of enforcement and a sovereign injury.

Starting with the former, the United States argues that it faces a credible threat of prosecution for violating SB1. To bring such a pre-enforcement suit consistent with Article III, a plaintiff must "allege[] an intention" to do something prohibited by the statute and "a credible

threat of prosecution" under it. *LaFave v. Cnty. of Fairfax, Virginia*, 149 F.4th 476, 485 (4th Cir. 2025) (quoting *Susan B. Anthony List*, 573 U.S. at 159)). "To establish a credible threat of prosecution," a plaintiff must allege a fear of prosecution that is "actual and well-founded [enough to establish] that the statute will be enforced against them." *Maryland Shall Issue, Inc. v.* Hogan, 971 F.3d 199, 217 (4th Cir. 2020), *as amended* (Aug. 31, 2020). A plaintiff's "generalized fears and concerns do not establish an actual and well-founded fear of prosecution." *LaFave*, 149 F.4th at 486.

The United States has not established a credible threat of prosecution against its officers, let alone one that is imminent. Again, none of the named State Defendants have any enforcement authority under SB1. Thus, the United States is mistaken in arguing that the State Defendants "intend to enforce the Challenged Laws against federal law enforcement." Mem. Supp. Pl.'s Mot. Prelim. Inj. at 17, ECF No. 2–2. While the United States points to statements from the Maryland General Assembly as evidence of an intent to target federal officers, Mem. at 6, 17, those legislators are not parties to this suit. Nor are the officials with actual authority to enforce SB1—namely, the State's Attorneys. The United States has also not pointed to any evidence that federal officers face an imminent threat of enforcement by the State's Attorneys. Indeed, it is notable that Prince George's County had a face covering ordinance on the books from April of this year until State law displaced it on October 1, and that local ordinance was enforceable by the State's Attorney for Prince George's County. *See* Prince George's County Code § 18–124(d) (establishing that a law enforcement officer found in violation "shall be guilty of a misdemeanor and, upon conviction, subject to imprisonment not to exceed six (6) months and up to a five thousand dollar ($5000) fine"); *see also* Md. Code Ann., Crim. Proc. § 15–102 (authorizing the State's Attorney for the county to prosecute cases in which the State has an interest). Yet the United States cannot point to

a single instance of the State's Attorney for Prince George's County prosecuting a federal officer for a violation of this provision. Thus, the United States has not established a threat of enforcement that is certainly impending.

Even more, SB1 establishes that any enforcement action could result, at most, in a civil fine not exceeding $1,500. Md. Code Ann., Pub. Safety § 3–536(d)(1); *id.* § 3–537(d)(1). There is no risk of arrest or criminal conviction. Given the "purely civil nature" of the law, this Court can be less concerned about the "attenuated risk of enforcement" as the basis for Article III jurisdiction, since "the same arguments made in the pre-enforcement challenge can be raised as affirmative defenses later." *Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 222 (3d Cir. 2023).

Turning to the alleged sovereign injury, the United States argues that "Defendants' attempt to regulate the conduct of the Federal Government itself inflicts a 'sovereign injury' on the United States." Mem. at 15. The United States appears to argue that it need not demonstrate any actual or imminent injury because the mere existence of SB1 inflicts a sovereign injury. But the United States cites no authority supporting this view, and other courts have soundly rejected it. *See United States v. California*, 824 F. Supp. 3d 1079, 1083 (C.D. Cal. 2026) "[United States] presents no binding authority holding that the mere *existence* of a preempted state law creates a sovereign injury to the federal government." (emphasis in original)); *United States v. City of Bos.*, 833 F. Supp. 3d 30, 45 (D. Mass. 2026) ("The United States cites no on-point authority for this essentially limitless view of sovereign injury.").

To be sure, the federal government, like the States, may assert an "injury to its sovereignty arising from violation of its laws." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). But the United States must articulate some concrete harm beyond the mere existence

of a state law that arguably violates the Supremacy Clause. *See California*, 824 F. Supp. 3d at 1083–84 ("Perhaps [a state's] *enforcement* of the subject laws and regulations could give rise to an injury in fact by impeding the operations or functions of the federal government, but [the United States] neither pleads nor presents such a theory.") (emphasis in original)). To hold otherwise would mean that the federal government has standing to sue over any state law that arguably violates the Supremacy Clause, regardless of whether the challenged law inflicts any injury on the federal government. This view is inconsistent with the limitations of Article III. *See California v. Texas*, 593 U.S. 659, 670–71 (2021) ("The party who invokes the power [of Article III courts] must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement" (citation omitted)). So too, if the only harm from SB1 is the existence of the law itself, then the United States is effectively seeking "a declaratory judgment of the Act's invalidity," which "is the very kind of relief that cannot alone supply jurisdiction otherwise absent." *City of Bos.*, 833 F. Supp. 3d at 45 (quoting *California*, 593 U.S. at 673); *see also Maryland v. United States*, 360 F. Supp. 3d 288, 316 (D. Md. 2019) ("[I]t is quite clear that the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." (quoting *Flast v. Cohen*, 392 U.S. 83, 96 (1968)). Simply put, the United States cannot rely on its "sovereign interest" alone to establish the injury in fact.

In bringing this pre-enforcement suit, the United States has not established an injury in fact, and Count I against the State Defendants should be dismissed.

## II. <u>The United States Has Not Established the Elements for a Preliminary Injunction</u>

### A. The United States Has Not Shown That It Is Likely to Suffer Irreparable Harm

A party seeking a preliminary injunction must demonstrate that that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent'" and that the harm "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019)). The United States has not met its burden.

The United States' key argument is that a Supremacy Clause violation, in and of itself, results in irreparable harm. Mem. at 24. Not so. Much like the United States' argument on standing, this position would eviscerate the standard for a preliminary injunction, allowing the federal government to obtain a preliminary injunction anytime it sues over a Supremacy Clause violation. But "[a]n injunction 'does not follow from [a likelihood of] success on the merits as a matter of course,'" and therefore "the Supreme Court has made clear that Plaintiffs must do more to warrant the extraordinary remedy of preliminary injunctive relief." *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 247 (2d Cir. 2025) (quoting *Winter*, 555 U.S. at 32), *cert. granted sub nom. Grant v. Higgins*, 146 S. Ct. 2811 (2026). To be sure, courts have held that the irreparable harm factor *can* be satisfied when there is a likely constitutional violation, because "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 394 (D. Md. 2022) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). But the United States has not cited any support for its assertion that this is outcome "automatic," Mem. at 24; instead, the

cases cited by the United States only support the principle that "[i]rreparable injury *may possibly* be established" when a state statute is "flagrantly and patently" unconstitutional, *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 366 (1989) (emphasis added).

Further, unlike other constitutional provisions, the Supremacy Clause "is not the source of any federal rights." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325–26 (2015). Unsurprisingly, then, the United States does not identify any court in this Circuit holding "that a violation of the Supremacy Clause gives rise to irreparable harm *per se*." *Ass'n of Am. Publishers*, 586 F. Supp. at 394. Instead, courts in this Circuit have "analyzed the likelihood of irreparable harm by considering the practical effects of the state laws on the plaintiffs." *Id.* (citing *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013)). So too, here, this Court should reject the United States' radical suggestion to find irreparable harm per se, and instead analyze the practical effect of SB1 in assessing irreparable harm.

Looking to the practical effects of the law, the United States argues that SB1 poses irreparable harm by endangering federal officers, impeding federal functions, and chilling federal activities. But each of these harms would arise, if at all, only from compliance with SB1. Indeed, the United States seems to accept as much. *See* Mem. at 3 ("If federal officers comply with the Challenged Laws, they face heightened risks of doxxing and harassment, and their law enforcement operations will be compromised."). But as the United States has stated, emphatically—"the Federal Government will not comply with these Challenged Laws." Mem. at 16; *see also* Paul Decl. ¶ 18, ECF No. 2–3 ("FBI Special Agents in the Baltimore Field Office will disregard the above-described Maryland Bills."); Allen Decl. ¶ 26, ECF No. 2, ECF No. 2–4 ("DEA does not intend to require Special Agents to comply with [SB1]."); Baker Decl. ¶ 50, ECF No. 2–5 ("ICE has no intention of complying with Maryland Senate Bill 1 . . . ."). The United

States cannot have it both ways, arguing both that it will not comply with SB1 and simultaneously that it will be irreparably harmed from compliance with SB1. If the United States is to be taken at its word that it will not comply with SB1, then there can be no irreparable harm from complying.

Instead, the only potential harm that the United States identifies is the possibility of a civil offense, with a capped fine imposed after trial Under SB1, however, no fine could be imposed on a defendant until after a trial, Md. Code Ann., Pub. Safety § 3–536(e)(6); *id.* § 3–537(6), during which any arguments about the Supremacy Clause may be raised. In other words, no financial consequence would flow during the pendency of this litigation, if at all, without a court first deciding the merits of any arguments under the Supremacy Clause.

Beyond failing to show the existence of any irreparable injury, the United States also cannot "demonstrate a causal connection between the alleged harm and the actions to be enjoined." *Hunter Grp., Inc. v. Smith*, 164 F.3d 624 (4th Cir. 1998). As support for its argument that enforcement of SB1 would cause harm to federal officers, the United States has pointed to an increase in threats to federal agents around the country. *See* Mem. at 25–26. But they cannot show a causal link to any state law requiring federal officers to identify themselves or cease wearing face coverings. *Cf.* Decl. Scott Shuchart ¶¶ 27, 30, ECF 31–6, *USA v. State of Connecticut et al.*, 26-cv-00758-VDO (D. Conn.) (former ICE official stating that threats, assaults, and harassment of federal agents have long pre-dated recent prevalence of agent masking). And while the United States argues, without support, that requiring federal officers to identify themselves would undermine officer safety and operational effectiveness, it is equally (if not more) likely that such a requirement would engender more trust from the public, as identification is, in the words of a former DOJ official, "a basic component of transparency and accountability," and "a near-

universal requirement of sound policing practices[.]" Decl. Christy E. Lopez ¶ 7, ECF 31–9, *USA v. Connecticut*.

Accordingly, the United States has failed to establish irreparable harm warranting a preliminary injunction.

**B. The United States Is Unlikely to Succeed on the Merits**

The United States has also failed to demonstrate that it is likely to succeed on the merits of its claims. First, it has failed to prove it has standing to challenge SB1. Second, it has not demonstrated that SB1 violates the intergovernmental immunity doctrine, and this Court should decline the United States' invitation to decide a question of constitutional law that is not necessary to resolve this dispute.

i. <u>The United States Has Failed to Establish Standing</u>

At the preliminary injunction stage, the standard for establishing irreparable harm "mirrors that of injury for purposes of Article III standing," but the plaintiff "faces a higher burden to satisfy this prong of the preliminary injunction standard." *Maryland v. Mullin*, 831 F. Supp. 3d 325, 369 (D. Md. 2026). For the reasons discussed above, the United States lacks standing to bring this suit against the State Defendants because the State Defendants are not proper parties and because the United States has not established an injury-in-fact. Given the United States has not established standing, its motion to preliminarily enjoin SB1 should be denied.

ii. <u>Even If This Court Had Jurisdiction, the United States' Facial Challenge to SB1 Is Unlikely to Succeed</u>

The United States alleges that SB1 violates the intergovernmental immunity doctrine because the Act purportedly regulates the federal government. This argument is unlikely to succeed because the United States has not shown that SB1 interferes with or controls any federal function, let alone that it does so to support a facial challenge. Further, the canon of constitutional

avoidance weighs against deciding this broad challenge to a state statute in the absence of any application.

The intergovernmental immunity doctrine is a judicially-created doctrine under the Supremacy Clause that generally prohibits "state laws that either 'regulat[e] the United States directly or discriminat[e] against the Federal Government or those with whom it deals' (e.g., contractors)." *United States v. Washington*, 596 U.S. 832, 835 (2022) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990)). The concern "[a]t the heart" of the doctrine is "preventing discrimination against the Federal Government." *Id.* at 841. Thus, many cases striking down State laws on intergovernmental immunity grounds—including the seminal decision in *McCulloch v. Maryland*, 17 U.S. 316, 425–37 (1819)—involved improper discrimination against federal entities or federal officers. *E.g. id.* at 835.

A distinct prong of intergovernmental immunity, however, prohibits certain direct regulations of the federal government. But the direct regulation prong "prohibit[s] State from interfering with or controlling the operations of the Federal Government." *Id.* at 838 (emphasis added). Federal agencies "are only exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the[ir] functions," because otherwise the doctrine would be "convert[ed]" "into an unauthorized and unjustifiable invasion of the rights of the States." *National Bank v. Commonwealth*, 76 U.S. 353, 362 (1869). Therefore, the direct regulation prong does not bar "all state regulation which may touch the activities of the Federal Government," *Hancock v. Train*, 426 U.S. 167, 176 (1976), and the Supreme Court has "thoroughly repudiated" the view that "any state regulation which indirectly regulates the Federal Government's activity is unconstitutional," *North Dakota*, 495 U.S. at 434–35; *cf. Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 270–71 (1943) (holding that state regulation of

federal contractor's milk prices did not violate intergovernmental immunity even though it increased the federal government's procurement costs but instead "are to be regarded as the normal incidents of the operation within the same territory of a dual system of government"). Instead, the critical question is whether state laws "affect incidentally the mode of carrying out [federal] employment," or rather seek to "control" federal functions. *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920).

In bringing this suit, the United States does not claim that SB1 discriminates against the federal government. Nor could it, as the law applies to all law enforcement officers operating within the State, whether they work for an agency of the state of Maryland, another state, or the federal government. *See* Md. Code Ann., Pub. Safety § 3–536(a)(3). Instead, the United States argues only that SB1 impermissibly regulates the federal government. This argument is likely to fail.

To start, the United States cannot succeed in showing that SB1 controls or interferes with federal functions. When considering challenges under the intergovernmental immunity doctrine, most court decisions over the "direct regulation" prong have involved state-imposed taxation, fees, permit schemes, or license requirements that operated as gatekeeping instruments. For instance, in *Johnson v. Maryland*, the Supreme Court struck down a state law that imposed "a requirements that [federal officials] desist from performance" of their duties until they passed an examination and "pa[id] a fee for permission to go on." 254 U.S. at 57. "Such a requirement," the Court said, "does not merely touch the Government servants remotely by a general rule of conduct" but instead "lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient." *Id.* Likewise, in *Hancock v. Train*, the

Supreme Court struck down a state permitting requirement because its effect was "tantamount to prohibiting operation of the federal installations." 426 U.S. at 180.

Here, by contrast, SB1 does not impose qualifications on employment of federal law enforcement officers, nor does it control federal law enforcement activities in such a way as to interfere or prohibit law enforcement activities. The federal government remains as free as ever to decide who to employ, and federal law enforcement officers remain as free as they ever were to perform their federal functions. Requiring law enforcement officers to identify themselves and to not conceal themselves while performing their duties within the State simply "touch[es] the Government servants remotely by a general rule of conduct," *Johnson*. 254 U.S. at 57. SB1 therefore does not "control" federal law enforcement's essential functions or "interfere" with their operations, *Washington*, 596 U.S. at 838, but instead "affect[s] incidentally the mode of carrying out employment," *Johnson*, 254 U.S. at 56–57 (1920).[5]

The United States also argues that the exceptions built into SB1 do not cure the constitutional defects, but the United States does not identify a real scenario that does "not fit neatly within the exceptions." Mem. at 23. While the United States notes that protecting officers'

[5] The United States points to a letter from the Attorney General of Maryland to the Governor regarding his interpretation of the legality of SB1. *See* Mem. at 6–7 (citing Letter from Anthony G. Brown, Att'y Gen., to Wes Moore, Gov. of Md., at 2 (May 12, 2026), https://mgaleg.maryland.gov/2026RS/ag_letters/sb0001.pdf). "[I]t is common knowledge that before Governors of Maryland approve an act of the General Assembly the Attorney General of Maryland first reviews such legislation to determine whether, in his opinion, it is constitutional." *State ex rel. Atty. Gen. v. Burning Tree Club, Inc.*, 301 Md. 9, 34 (1984). Here, the Attorney General examined SB1 under the "not clearly unconstitutional standard," and ultimately concluded the bill passed the standard and "may be signed into law." Letter at 4. While the Attorney General observed "a substantial risk that a reviewing court would [] determine that SB 1 is unconstitutional as applied to federal law enforcement," the Attorney General also reasoned that "a court might reject an intergovernmental immunity argument if it determines that SB 1's mask and identification requirements do not actually control a law enforcement officer's federal duties or have only an incidental effect." *Id.* at 3.

personal identities "is particularly important during high-risk enforcement operations," Mem. at 23 n.16, SB1 expressly "does not apply to a law enforcement officer actively engaged in an undercover operation," Md. Code Ann., Pub. Safety § 3–536(b); *id.* § 3–537(b). Further, the Commission's Uniform Policy allows for even greater flexibility, permitting "a deviation from policy" in the case of "an active field emergency or an imminent, demonstrable threat to the health or safety of an officer." Uniform Policy at 4. Thus, the United States cannot point to an instance where enforcement of SB1 would actually interfere with federal law enforcement operations.

These gaps in the United States' arguments only underscore a fundamental flaw—the United States cannot meet the high burden to show that SB1 is facially unconstitutional. "The Supreme Court generally disfavors facial challenges because they 'often rest on speculation,' can lead courts unnecessarily to anticipate constitutional questions or formulate broad constitutional rules, and may prevent governmental officers from implementing laws 'in a manner consistent with the Constitution.'" *Fusaro v. Howard*, 19 F.4th 357, 373 (4th Cir. 2021) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)). Facial challenges therefore face a "particularly demanding standard," and a challenger "must establish no set of circumstances exists under which [an act] would be valid." *Id.* (quoting *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016)).

Here, because the United States can point to no instances of enforcement or threatened enforcement against the federal government, it effectively argues that SB1 is unconstitutional on its face. Yet the United States cannot meet the demanding standard for a facial challenge. While the United States argues that SB1 can never validly be enforced against it, it also goes so far as to argue that "[f]ederal law enforcement agencies are not required to comply with individual state laws when operating within the scope of their official duties." Mem. at 21. This argument proves

too much. The United States simply cannot support the position that federal agencies are immune from *any* state laws. Indeed, the Supreme Court has already refuted that idea. *See Johnson*, 254 U.S. at 56 ("Of course an employee of the United States does not secure a general immunity from state law while acting in the course of his employment.").

Further, the cases cited by the United States involved as-applied challenges to the "direct regulation" prong of the intergovernmental immunity doctrine, not facial challenges. For instance, in *Johnson v. Maryland*, the case concerned an employee of the Post Office who "was arrested in Maryland, and was tried, convicted and fined for so driving without having obtained a license from the State." 254 U.S. at 55. Under those facts, the Supreme Court held that immunity "from state control in the performance of their duties" means that a state cannot "require qualifications in addition to those that the Government has pronounced sufficient" for employment and require to "pay a fee for permission to go on." *Id.* at 57. Likewise, in *Hancock v. Train*, the Supreme Court considered intergovernmental immunity in the context of a state permitting scheme where the state commission "continued to press the federal officials to apply for operating permits" and then brought a lawsuit to "require[e] the Army, TVA, and AEC facilities to secure operating permits." 426 U.S. at 176. The Court held, on the facts before it, that the state "place[d] a prohibition on the Federal Government" because the permit requirement was "not intended simply to regulate the amount of pollutants which the federal installations may discharge" but instead was "tantamount to prohibiting operation of the federal installations." *Id.* at 180. Lastly, in *United States v. Commonwealth of Virginia*, the Fourth Circuit held "that Supreme Court precedent precludes the application of Virginia's licensing and registration requirements to private investigators working solely for the FBI," but the Fourth Circuit reached that decision only after state officials informed the federal government "that Virginia planned to initiate enforcement action against those

unregistered and/or unlicensed BICS investigators working in Virginia." 139 F.3d 984, 986 (4th Cir. 1998).[6] In short, when considering challenges to state laws under the intergovernmental immunity doctrine, courts decide important questions of constitutional law in the face of actual enforcement against federal officials, not in the abstract.

Here, there is no factual scenario before this Court of how SB may be enforced. Instead, the United States brings a facial challenge to declare SB1 unlawful in all its applications. But the United States cannot support its position that a state prohibition on face coverings or concealing identification can *never* be appropriately enforced against a federal law enforcement officer. For instance, for the United States to be able to prevail, it would have to show there is no available application of the law that would pass constitutional muster. *See Fusaro*, 19 F.4th at 373. That would include having to show that it would be unconstitutional for the face covering provision to be enforced against federal law enforcement officers driving recklessly on the highway, or that the identification requirement could never be enforced against federal law enforcement officers seeking entry into state courthouses.

In the absence of any factual development or application of SB1, the United States' challenge "rest[s] on speculation" and requires this Court to resolve "a question of constitutional law in advance of the necessity of deciding it," potentially "formulat[ing] a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *United States v. Chappell*, 691 F.3d 388, 392 (4th Cir. 2012); *see also Fusaro v. Howard*, 472 F. Supp. 3d 234, 257 (D. Md. 2020) (noting the doctrine of constitutional avoidance "requires the federal courts to strive

[6] The United States also cites *Genesis GSA Strategic One, LLC v. Howard County*, in which a county revoked the construction permit of a federal contractor. No. 26-CV-915, 2026 WL 2294479, at *1 (D. Md. Aug. 10, 2026). The court expressly declined to decide the contractor's intergovernmental immunity claim based on direct regulation, however, and instead decided the case on the discriminatory prong—and even then, only "as applied" to the challenger. *Id.* at *19.

to avoid rendering constitutional rulings unless absolutely necessary" (quoting *Norfolk Southern Ry Co. v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010)), *aff'd*, 19 F.4th 357 (4th Cir. 2021)). This Court should decline to entertain the United States' facial challenge, and instead await to decide the issue of the intergovernmental immunity doctrine to an applied challenge, if the situation ever arises. *See Maryland*, 360 F. Supp. 3d at 317 ("Although the [plaintiff's] claim is not justiciable at this juncture, its claim may become ripe for review in the future, if its alleged injury move[s] from the speculative to the concrete" (citation omitted)).

Notwithstanding these flaws to their facial challenge, the United States points to recent court decisions around the country that preliminary enjoined similar laws. *See* Mem. at 19–20. These decisions do not resolve the questions before this Court for several reasons. First, these cases concerned different laws and defendants, and thus did not face the same threshold questions around standing and ripeness that this case presents. Further, many of these cases are at their early stages and subject to appeals. For instance, the district court's decision in *United States v. Virginia* is currently on appeal in the Fourth Circuit. *See United States v. Commonwealth of Virginia*, No. 26-2248 (4th Cir.). That decision from the Fourth Circuit could provide greater clarity on the proper standard for intergovernmental immunity claims.

Finally, these court decisions relied overwhelmingly, as does the United States' brief, on the Ninth Circuit's decision in *United States v. California*, 173 F.4th 1060 (9th Cir. 2026), granting the federal government's motion for an injunction pending appeal. In that decision, the Ninth Circuit held that a California law requiring law enforcement to display a badge or name tag likely constituted an impermissible direct regulation of federal agents because it "does not regulate conduct that any ordinary citizen could perform," but rather "applies exclusively to law enforcement agencies and their officers, including federal law enforcement agencies and federal

law enforcement officers." *Id.* at 1068. The Ninth Circuit later adopted the same reasoning in its decision reversing the district court's decision and remanding with instructions to enter a preliminary injunction. *United States v. California*, No. 26-926, 2026 WL 3071018 at *2, 7 (9th Cir. Oct. 14, 2026).

The Ninth Circuit's analysis is not persuasive. For starters, the Ninth Circuit treated the fact that the California law applied only to law enforcement, instead of to "ordinary citizens," as proof of an impermissible direct regulation. *See California*, 2026 WL 3071018 at *7 (reasoning that state law directly regulated federal officers because it "applies *exclusively* to law enforcement officials and *exclusively* to their performance of law enforcement operations" instead of to "conduct that any ordinary citizen could engage in" (emphasis in original)). The Ninth Circuit accordingly held that "the statute is invalid in all applications" and that the "United States is therefore likely—indeed, certain—to succeed on the merits of its facial challenge." *Id.* at *6.

The Ninth Circuit's "ordinary citizen" test appears nowhere in the case law. It also appears to conflate the direct regulation prong of intergovernmental immunity with the discrimination prong. The Supreme Court has explained, for instance, that whether a law "regulates [federal agencies or contractors] unfavorably on some basis related to their governmental 'status'" is appropriately analyzed under the discrimination prong. *Washington*, 596 U.S. at 839 (quoting *North Dakota*, 495 U.S. at 438 (plurality op.)) (emphasis added). By adopting a new standard of constitutional review, the Ninth Circuit resolved "a question of constitutional law in advance of the necessity of deciding it," thereby "formulat[ing] a rule of constitutional law" that is potentially "broader than is required by the precise facts to which it [could be] to be applied." *Chappell*, 691 F.3d at 392.

Further, the Ninth Circuit's reasoning that there is no "de minimis" exception to intergovernmental immunity, *California*, 2026 WL 3071018 at *7, conflicts with Supreme Court precedent that the direct regulation prong does not bar "all state regulation which may touch the activities of the Federal Government," *Hancock*, 426 U.S. at 176 (1976). To be sure, the Ninth Circuit acknowledged that "States *might* be able to impose on federal officers 'general rules that might affect incidentally the mode of carrying out the[ir] employment.'" *California*, 2026 WL 3071018 at *7 (emphasis in original). But the Ninth Circuit dismissed that exception as applying because "the [Supreme] Court has never relied on that distinction to uphold a State's direct regulation of federal functions performed by federal officers." *Id.* Again, the Ninth Circuit relied on its novel "ordinary citizen" test to decide that regulating activity performed by certain federal officers—even if that activity is also performed by non-federal officers—can never qualify as an incidental effect.

In short, the Ninth Circuit's decision expanded beyond existing precedent on the intergovernmental immunity doctrine to hold that California's law was facially unconstitutional in all its applications. This Court need not venture so far in deciding novel questions of constitutional law. In the absence of any enforcement actions, and in the absence of any State Defendant before this Court with authority to enforce the law, this Court can avoid ruling on novel questions of constitutional law and instead allow the United States to bring a claim when an enforcement action is brought against it, if ever.

### C. The Public Interest and Balance of the Equities Weigh Against Issuing a Preliminary Injunction

For government parties, the balance of hardships and the public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The court "must balance the competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief," with "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). Here, the balance of the equities and the public interest weigh against Plaintiffs' request for emergency relief.

On the State's side, enjoining SB1 would cause substantial harm to the public interest by depriving the State and its residents of the protections of its duly-enacted law. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"). The United States argues that there is no public interest in a state law that violates the Supremacy Clause. Mem. at 28–29. But that argument puts the cart before the horse, as, for the reasons discussed above, the United States has not shown a likelihood of success in its claim challenging SB1.

As to the United States, denying the preliminary injunction will not harm the federal government nor the public interest. Because the United States has emphatically declared its intention to not comply with SB1, there can be no purported harm to the public from federal officials complying with local laws, nor to officers from increased harassment, nor to law enforcement operations in the State of Maryland. And while SB1 does carry civil penalties, there is no imminent risk of federal officials facing those penalties, let alone from the named State Defendants who have no enforcement authority under SB1.

## CONCLUSION

For the reasons discussed above, this Court should grant the State Defendants' motion to dismiss, or, in the alternative, deny the United States' motion for a preliminary injunction.

Dated: October 26, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

*/s/ Lauren Gorodetsky*
Lauren Gorodetsky (D. Md. Bar No. 32172)
Adam Kirschner (D. Md. Bar No. 31767)
*Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-7057
lgorodetsky@oag.maryland.gov

*Counsel for State Defendants*